**DOUGLASS, Individually and on Behalf of his Minor Son, et al., Appellants,**

v.

**SALEM COMMUNITY HOSPITAL et al., Appellees.**

[Cite as *Douglass v. Salem Community Hosp.*, 153 Ohio App.3d 350, 2003-Ohio-4006.]

Court of Appeals of Ohio,
Seventh District, Columbiana County.

No. 2002-CO-07.

Decided July 23, 2003.

352

Gurrera, Taylor & Makricostas and Vincent S. Gurrera, for appellants.

Comstock, Springer & Wilson and David C. Comstock, for appellees.

GENE DONOFRIO, Judge.

{¶ 1} Plaintiffs-appellants, S.K., James and Kathy Pahanish, and F.C., appeal from the judgment of the Columbiana County Common Pleas Court striking the affidavit of appellants' expert witness and granting summary judgment in favor of defendant-appellee, Salem Community Hospital.

{¶ 2} In 1987, Wagner was hired as the hospital's assistant director of social services. He had some administrative responsibilities, but also counseled all types of people, from children to adolescents to adults. When Wagner was hired,

it was not the hospital's policy to do reference checks prior to making the offer of employment. Thus, the human resources department did not attempt to conduct a reference check on Wagner until after he was offered employment. When it conducted the reference check, the hospital sent out a form letter to some of Wagner's previous employers as well as to one of his personal references. Some of those references were returned to the hospital. However, Wagner's immediately previous place of employment, Western Reserve Care System, did not return a reference. It was the hospital's policy not to follow up on references that were not returned due to the litigious environment surrounding such recommendations. However, Wagner's immediate supervisor, the hospital's director of social services, Betsy Williams, called someone at Western Reserve and that person gave her a positive oral recommendation of Wagner. Hospital personnel concede that Wagner would not have been hired if Western Reserve had given a negative reference.

{¶ 3} After Wagner had been employed at the hospital for a few years, Williams began to hear concerns from his coworkers about some of his behavior. For instance, some of those coworkers had expressed how odd it was that Wagner spent such a large amount of his time with the children he was counseling, even outside the hospital environment. Williams confronted Wagner about those concerns and he agreed to limit his visits with patients to hospital hours and one followup visit. She also warned Wagner against getting involved in the family-related activities of his minor patients. Wagner agreed to comply with Williams's requests and, after speaking with Wagner about those concerns, no one ever informed Williams that Wagner had resumed those activities.

{¶ 4} In November 1991, someone told Williams that they were surprised that Wagner was working for the hospital, considering what had happened at Western Reserve. This raised questions in Williams's mind. The person did not tell Williams the substance of what happened and she could not find any information to substantiate what little the person had said.

{¶ 5} On January 3, 1992, Wagner submitted a letter of resignation to the hospital to become effective on January 30, 1992. Apparently, Wagner was seeking employment at St. Elizabeth's Hospital in Youngstown, Ohio. Shortly thereafter, on January 8, 1992, the hospital's vice-president of human resources, John Lenzi, received a phone call from his counterpart at Western Reserve, Bill Cummings, and Western Reserve's labor attorney, John Stein. Western Reserve had received a phone call from someone attempting to conduct a reference check on Wagner. Mistakenly believing that the hospital was the potential employer who was actually conducting the reference check, Cummings and Stein called Lenzi to make him aware that while Wagner was employed at Western Reserve there were some problems concerning Wagner's associations with young children

outside the hospital. It appears that in 1987, the police informed Western Reserve that Wagner had been accused of exposing himself and molesting children and those accusations were being investigated at that time. After being asked about this by Western Reserve, Wagner admitted that he was under investigation by the police. As a consequence of Western Reserve's finding this information out, Wagner resigned his employment on the condition that Western Reserve would state to those conducting reference checks in the future that he had voluntarily resigned.

{¶ 6} After hearing this information, Lenzi called Williams and her immediate supervisor, Karen Kazel, into his office to discuss the situation. Lenzi never told Williams exactly what he was told by Western Reserve, only that Western Reserve called and said the hospital should not hire Wagner. The three decided to make January 10, 1992, Wagner's last day with the hospital. However, they agreed that Wagner should be paid through January 30, 1992. In order to ensure that Wagner did not successfully rescind his resignation, the position of assistant director of social services was eliminated and those functions were spread among other members of the department. Lenzi also called his counterpart at St. Elizabeth's about what he had found out. At no time did anyone at the hospital inform Wagner that the hospital had found out the reason he left Western Reserve. It also did not inform either Wagner's present or former patients of the reason Wagner was no longer employed at the hospital. The hospital did not report its suspicions to any authority. As Kazel and Lenzi both stated, the hospital's goal was to pay Wagner off and get him out of the hospital as soon as possible.

{¶ 7} In 1989, while Wagner was working at the hospital, F.C.'s father, Eric Douglass, took him to the hospital for counseling. F.C. was seven years old at the time and his parents had just divorced. Eric thought that counseling would help F.C. cope with that divorce. F.C.'s counselor at the hospital was Wagner. After a few sessions, F.C. no longer visited Wagner at the hospital. However, Wagner maintained a continuing relationship with F.C. outside the hospital. He would pick F.C. up and take him and other children on day trips to amusement parks, swimming, and other activities. Eric assumed that this was an extension of the counseling the hospital was providing him. Thus, he never questioned whether this relationship was condoned by the hospital. He never received a bill for the counseling F.C. received either inside or outside the hospital. Eric also never learned that Wagner had quit his employment with the hospital in January 1992.

{¶ 8} In July 1995, Wagner invited 13-year-old F.C. to his house in Youngstown for a weekend stay, the first time F.C. would be spending the night at Wagner's residence. F.C. asked his 15-year-old cousin, S.K., if he would go as well. S.K.

asked his mother, Kathy, if he could go. Kathy was acquainted with Wagner and the hospital's other social service people through her work in a nursing home. She understood that the visit was to involve Wagner in some professional manner with her son.

{¶ 9} Kathy called Williams to ask her advice on whether S.K. should accompany F.C. to Wagner's residence. Kathy's understanding of the conversation was that Williams gave a positive reference about Wagner, that Wagner "would be good." Williams did not tell Kathy about any suspicions about Wagner or that Wagner was no longer employed at the hospital. Based in part on Williams's statements, Kathy allowed her son to accompany F.C. to Wagner's residence for the weekend. That weekend, and over the course of the next few months, Wagner gave the two boys marijuana and beer and either masturbated or performed oral sex on them. He then threatened the boys with harm if they either told anyone what was going on or refused to return for future visits. Eventually, both F.C. and S.K. disclosed how they had been molested. Wagner was later convicted of crimes relating to the molestation of these boys.

{¶ 10} Subsequently, appellants filed a complaint against the hospital that alleged nine causes of action: negligent hiring, respondeat superior, negligent entrustment, two counts of negligence, negligent supervision, violations of rights protected by statute and regulation, breach of fiduciary duty, and breach of contract. Following discovery, the hospital moved for summary judgment against appellants, claiming that they could demonstrate no genuine issues of material fact on any of their nine claims. Appellants responded to that motion. The hospital then filed a reply memorandum in support of its motion for summary judgment. Contemporaneous with that reply memorandum, the hospital moved to strike the affidavit of appellants' expert witness, Dr. Bernard Katz, contending that the affidavit failed to comply with the requirements of Civ.R. 56(E) and Evid.R. 702. Appellants never responded to this motion.

{¶ 11} Subsequently, the trial court entered an "Announcement of Decision." In that entry, the court stated that it intended to sustain the hospital's motion for summary judgment. It refrained from issuing its actual opinion and order "because of the press of other court business" and canceled the final status conference and the trial, both of which had already been scheduled. It further clarified that this entry was not intended to be a final, appealable order.

{¶ 12} The trial court later entered its final opinion and judgment entry. Within that entry, the trial court first granted the hospital's motion to strike Katz's affidavit, finding that the affidavit failed to meet the requirements of either Civ.R. 56(E) or Evid.R. 702. The trial court then granted the hospital's motion for summary judgment, finding that no material issues of fact remained on any of appellants' nine claims.

{¶ 13} Appellants set forth five assignments of error. Appellants' fifth assignment of error states:

{¶ 14} "The trial court committed prejudicial error and an abuse of discretion when it held that Plaintiff's expert, Dr. Bernard Katz, was not qualified to testify about administrative [sic] including procedures and excluding his testimony and affidavit."

{¶ 15} Because the trial court's decision on the motion to strike Katz's affidavit may substantially affect our analysis of the remaining assignments of error, appellants' last assignment of error will be addressed first.

{¶ 16} In their fifth assignment of error, appellants argue that the trial court abused its discretion when it struck Katz's affidavit for its failure to comply with Civ.R. 56(E) and Evid.R. 702, as Katz's curriculum vitae and his deposition establish his qualifications to render an expert opinion in this case. The hospital argues that appellants' failure to file a response to the motion to strike the affidavit waives this argument on appeal. It then argues that even if appellants had properly responded to the hospital's motion to strike, the trial court properly granted the motion because Katz's affidavit contains numerous legal conclusions, such as the hospital "acted in an egregious, negligent, wanton and reckless manner" and whether the hospital complied with Ohio law, and renders expert opinions on issues in which he is not qualified as an expert. In their reply brief, appellants contend that they were not given the opportunity to respond to the motion to strike and, thus, they did not waive their ability to raise this assignment of error. They also reiterate their argument that Katz was qualified to render the expert opinions found in his affidavit.

{¶ 17} Before addressing the substance of this assignment of error, we must first address the hospital's contention that appellants have waived this assignment of error. The hospital argues that appellants' failure to file a responsive memorandum to the motion to strike Katz's affidavit is a failure to call the trial court's attention to an error that could have been avoided or corrected and, thus, appellants may not raise any objections to the hospital's motion to strike on appeal. However, the cases the hospital relies upon when making its argument do not apply to the present situation. For instance, the hospital cites *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus, for the proposition that "[a]n appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court" and to *Stores Realty Co. v. Cleveland* (1975), 41 Ohio St.2d 41, 43, 70 O.O.2d 123, 322 N.E.2d 629, for the proposition that appellants' objections to the motion to strike may not be raised on appeal. These cases deal with the failure to initially raise an issue

before the trial court, not with the failure to respond to an issue raised by an adverse party. For example, these are appropriate cases to cite when a party has failed to object to certain testimony, see *McDonald & Co. Securities., Inc., Gradison Div. v. Alzheimer's Disease & Related Disorders Assn., Inc.* (2000), 140 Ohio App.3d 358, 365, 747 N.E.2d 843, or has failed to move for a change of venue, see *State v. Coley* (2001), 93 Ohio St.3d 253, 258, 754 N.E.2d 1129. However, they do not specifically address whether an adverse party waives any arguments relating to a trial court's decision to grant a motion if that party has failed to explain why it believes that the motion should not be granted.

{¶ 18} In other cases, Ohio's appellate courts have not agreed with the hospital's argument. For example, in *Sharma v. Hummer* (Apr. 27, 2001), 6th Dist. No. WD–00–047, 2001 WL 460281, the defendants moved for summary judgment. The plaintiffs filed four affidavits, apparently in response to the defendant's motion for summary judgment. The defendants then moved to strike those four affidavits. The court initially noted that the plaintiffs never filed any documents in response to the defendant's motion to strike. Without addressing whether the plaintiff's failure to file a response to the motion to strike waived any arguments the plaintiffs may want to raise, the court affirmatively addressed whether the affidavits were properly struck.

■ {¶ 19} We agree with the result in *Sharma* because a party's attempt to introduce an affidavit into evidence is sufficient to preserve any arguments that party may on appeal have about that affidavit's admissibility. Given this conclusion, the hospital's claim that appellants have waived this argument is meritless.

{¶ 20} In the substance of this assignment of error, appellants argue that the trial court abused its discretion when it struck Katz's affidavit because that affidavit complied with the procedural and evidentiary rules governing the admissibility of expert opinion affidavits during summary judgment proceedings. A trial court's decision to grant or deny a motion to strike is within its sound discretion and will not be overturned on appeal unless the trial court abuses its discretion. *Early v. Toledo Blade* (1998), 130 Ohio App.3d 302, 318, 720 N.E.2d 107; *Foreclosure of Liens for Delinquent Land Taxes by Action Taken in Rem v. Parcels of Land Encumbered with Delinquent Tax Liens* (Feb. 9, 2000), 7th Dist. No. 96–489–CA, at 2, 2000 WL 184256. Similarly, the decision regarding the admission of testimony of an expert witness lies within the sound discretion of the trial court and will not be disturbed unless the trial court abuses that discretion. *Scott v. Yates* (1994), 71 Ohio St.3d 219, 221, 643 N.E.2d 105. An abuse of discretion constitutes more than an error of law or judgment; it implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. A trial court abuses its discretion when its decision is "so palpably and grossly violative

of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason, but rather of passion or bias." *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 87, 19 OBR 123, 482 N.E.2d 1248.

{¶ 21} Pursuant to Civ.R. 56(C), a court may not consider any evidence when ruling on a motion for summary judgment unless it conforms with Civ.R. 56. According to Civ.R. 56(E), "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit." Thus, affidavits containing opinions, like the one in this case, must meet the requirements in the Rules of Evidence governing the admissibility of opinions. *Tomlinson v. Cincinnati* (1983), 4 Ohio St.3d 66, 4 OBR 155, 446 N.E.2d 454, paragraph one of the syllabus. In this case, appellants do not attempt to argue that Katz's opinion would be admissible under Evid.R. 701 governing the opinions of lay witnesses. Indeed, Katz's affidavit itself purports to be that of an expert witness. Thus, in order for this affidavit to be considered in ruling on the hospital's motion for summary judgment, it must meet the requirements of Evid.R. 702. In order to comply with Civ.R. 56(E) and Evid.R. 702, an expert affidavit must set forth the expert's credentials and the facts supporting the expert's opinion which would be admissible into evidence. *Hall v. Fairmont Homes, Inc.* (1995), 105 Ohio App.3d 424, 434, 664 N.E.2d 546.

{¶ 22} The parties' initial disagreement is over whether the trial court, and therefore this court, may rely upon Katz's curriculum vitae in determining whether he is qualified to render his expert testimony, as appellants failed to attach Katz's curriculum vitae to his affidavit. Katz's affidavit gives a brief example of his qualifications as an expert. It then refers to an "attached" curriculum vitae as further proof of his bona fides. However, appellants failed to attach that document to the affidavit. Civ.R. 56(E) provides that "[s]worn or certified copies of all papers or parts of papers referred to in an affidavit shall be attached to or served with the affidavit." If a paragraph makes reference to a document which is not properly attached under Civ.R. 56(E), then a trial court may properly strike that paragraph. *Wall v. Firelands Radiology, Inc.* (1995), 106 Ohio App.3d 313, 336, 666 N.E.2d 235.

{¶ 23} Appellants argue that Katz's curriculum vitae is properly before the court when it is ruling on the hospital's motion for summary judgment because it was attached to their disclosure of expert witnesses filed on October 11, 2001. This argument is meritless.

{¶ 24} Civ.R. 56 allows a court to consider only "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence,

and written stipulations of fact, if any, timely filed in the action" when ruling on a motion for summary judgment. Civ.R. 56(C). A disclosure of expert witnesses does not fit any of these categories.

{¶ 25} "The proper procedure for introducing evidentiary matter not specifically authorized by Civ.R. 56(C) is to incorporate it by reference in a properly framed affidavit pursuant to Civ.R. 56(E)." *Biskupich v. Westbay Manor Nursing Home* (1986), 33 Ohio App.3d 220, 222, 515 N.E.2d 632. "The requirement of Civ.R. 56(E) that sworn or certified copies of all papers referred to in the affidavit be attached is satisfied by attaching the papers to the affidavit, coupled with a statement therein that such copies are true copies and reproductions." *State ex rel. Corrigan v. Seminatore* (1981), 66 Ohio St.2d 459, 467, 20 O.O.3d 388, 423 N.E.2d 105. The referenced papers may also be "sworn or certified" by a certification contained within the paper itself. *Olverson v. Butler* (1975), 45 Ohio App.2d 9, 12, 74 O.O.2d 11, 340 N.E.2d 436. Finally, it is well settled that unauthenticated documents which are not sworn, certified, or authenticated by way of affidavit have no evidentiary value and may not be considered by the trial court in ruling on a motion for summary judgment. *Citizens Ins. Co. v. Burkes* (1978), 56 Ohio App.2d 88, 95–96, 10 O.O.3d 119, 381 N.E.2d 963; *Sparks v. Erie Cty. Bd. of Commrs.* (Jan. 16, 1998), 6th Dist. No. E–97–007, 1998 WL 15929.

{¶ 26} Here, the record does not demonstrate that Katz's curriculum vitae was properly served or certified. It is not self-authenticating under Evid.R. 902. Likewise, there is no statement in the record that this document is a true reproduction. Thus, neither the trial court nor this court may rely upon Katz's curriculum vitae in determining whether he was qualified to be an expert in this case. See *Buzzard v. Pub. Emp. Retirement Sys. of Ohio* (2000), 139 Ohio App.3d 632, 636, 745 N.E.2d 442.

{¶ 27} After determining that we may not rely on Katz's affidavit when deciding whether the trial court abused its discretion when it struck that affidavit, we conclude that the trial court did not abuse its discretion when it struck that affidavit. Many of the "opinions" contained in that affidavit were unsupported conclusory statements. In addition, Katz's affidavit and deposition demonstrate that he was not qualified to render many of the other opinions contained in that affidavit. Finally, the remainder of that affidavit is largely irrelevant. Accordingly, the affidavit did not comply with Civ.R. 56(E) and Evid.R. 702.

{¶ 28} It is improper for an expert's affidavit to set forth conclusory statements and legal conclusions without sufficient supporting facts. *Wall v. Firelands Radiology, Inc.*, 106 Ohio App.3d at 335–336, 666 N.E.2d 235; *Davis v.*

*Schindler Elevator Corp.* (1994), 98 Ohio App.3d 18, 21, 647 N.E.2d 827; Evid.R. 704; Evid.R. 705. Letting expert witnesses make these types of unsupported conclusions creates the possibility, if not the probability, of misinterpretation of the legal standard by the witness and the factfinder's inability to perceive this misinterpretation. *Gannett v. Booher* (1983), 12 Ohio App.3d 49, 53, 12 OBR 190, 465 N.E.2d 1326, at fn. 4. However, pursuant to Evid.R. 704, an expert's opinion is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact if that opinion is otherwise admissible. It must be kept in mind that opinions that embrace an ultimate issue must still be both relevant and helpful to the trier of fact. *Lambert v. Shearer* (1992), 84 Ohio App.3d 266, 276, 616 N.E.2d 965.

{¶ 29} An example of a case in which an expert made an ultimate conclusion in his affidavit submitted in opposition to a motion for summary judgment that which the court found proper is *Smith v. Cincinnati Gas & Elec. Co.* (1991), 75 Ohio App.3d 567, 600 N.E.2d 325. In *Smith,* an expert affidavit filed by plaintiffs in response to the defendant's motion for summary judgment recited that in the expert's opinion, "the negligence of the [defendant] was the proximate cause of the [plaintiff's] injuries, * * * but for the negligence of [the defendant] [the plaintiff] would not have been injured * * * [and] without their negligence the * * * ultimate injury to [the plaintiff] would not have occurred." Id. at 570, 600 N.E.2d 325. The First District noted that the affidavit in question "expressly identified the list of depositions, statements * * *, and documents upon which the expert relied" when making his determination. Id. Because the affidavit contained both the expert's opinion and the data upon which the expert expressly relied, it was sufficient to defeat a motion for summary judgment. Id. at 571, 600 N.E.2d 325.

{¶ 30} In contrast, portions of this affidavit state the legal conclusion that the hospital was negligent and deviated from the standards of care but does not give any clue as to what the hospital was negligent of, i.e., it does not describe what standard of care the hospital failed to meet. This is not particularly helpful to the trier of fact, as appellants assert various negligence actions arising from different standards of care in this case. Thus, the trial court did not err when it struck the portions of Katz's affidavit that make unsupported conclusory statements.

{¶ 31} As stated above, we also conclude that Katz was not qualified to render many of the remaining opinions in his affidavit. When deciding whether an expert is qualified to render the opinions found in an affidavit in support of summary judgment, a court may look to other evidentiary matter, including depositions of the affiant not previously filed in the court. See *Cleveland Clinic Found. v. Commerce Group Benefits, Inc.* (Mar. 28, 2002), 8th Dist. No. 79907,

2002 WL 485764; *Williams v. 312 Walnut Ltd. Partnership* (Dec. 13, 1996), 1st Dist. No. C–960368, 1996 WL 741982. Ohio's standards regarding the admissibility of expert opinions are relatively lenient as to a determination of who is an expert but relatively strict in governing the admissibility of the expert testimony. *State v. Rangel* (2000), 140 Ohio App.3d 291, 295, 747 N.E.2d 291.

{¶ 32} To qualify as an expert, the witness must have some "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Evid.R. 702(B). An expert's testimony must either relate to matters beyond the knowledge or experience possessed by lay persons or dispel a misconception common among lay persons. Evid.R. 702(A). "Neither special education nor certification is necessary to confer expert status upon a witness. The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." *State v. Hartman* (2001), 93 Ohio St.3d 274, 285, 754 N.E.2d 1150, citing *State v. Baston* (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128; *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 191, 616 N.E.2d 909. Finally, the witness is an expert only if his or her testimony "is based on reliable scientific, technical, or other specialized information." Evid.R. 702(C). When applying this prong of Evid.R. 702, the trial court acts as a "gatekeeper" to ensure that the proffered information is sufficiently reliable. See *Kumho Tire Co., Ltd. v. Carmichael* (1999), 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238; *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469; *State v. Nemeth* (1998), 82 Ohio St.3d 202, 211, 694 N.E.2d 1332.

{¶ 33} As Katz's affidavit attests, he is a board-certified forensic psychiatrist who is or has been an associate clinical professor of psychiatry, the medical director of a hospital for the criminally insane, the chief psychiatric consultant for the Department of the Army, the senior clinical supervisor at a hospital, and the medical director and psychiatrist-in-chief of the outpatients' clinic for an institute. He has also previously testified as an expert both for plaintiffs and defendants in both civil and criminal matters.

{¶ 34} Katz claims that the expertise he brings to this case is due to his "experience as a psychiatrist and as a clinical administrator" and he does have experience which, on the surface, would appear to qualify him as an expert in this case. For example, most of his experience has been as a chief medical officer of various hospitals and psychiatric clinics. Additionally, he has given expert testimony in previous medical malpractice cases, which have included claims of faulty hiring practices. Finally, as chief medical officer of a hospital, it was his responsibility to ensure that the hospital hired properly qualified people.

{¶ 35} Although Katz's experience indicates that he may be able to testify as an expert in this case, a closer examination of his deposition testimony reveals his lack of expertise with the issues involved in this case. For example, he testified that cases involving claims of faulty hiring practices are not the typical cases in which he is involved. Furthermore, he does not know the law in Ohio regarding reference checks. Katz's affidavit claims that the hospital's actions in hiring Wagner did not meet the applicable standard of care, but admits that he does not know what standards exist in the various employment organizations with respect to employment procedures. He has never worked in human resources nor is he acquainted with federal law regarding employment practices. He does not even know whether written standards governing employment practices exist. Finally, Katz did not remember testifying as an expert in a case that involves an allegation relating to the employment of someone who has a background such that they should not have been hired.

{¶ 36} As the hospital concedes, these facts demonstrate that Katz appears to be eminently qualified to give an expert opinion on issues such as the quality of the mental health care given to a particular patient. The hospital argues that this is not the issue in this case and that Katz is not competent to give expert testimony on the administrative procedures surrounding the hospital's employment practices. We agree. For instance, Katz clearly cannot testify as to bad record-keeping procedures in human resources, bad hiring or firing procedures relating to record checks, or the hospital's alleged failure to comply with Ohio law. In addition, some statements, such as the conclusion that the hospital "consciously and intentionally * * * covered up and deceptively hid their suspicions of Timothy Wagner" are factual conclusions rather than expert opinions and, thus, should be stricken. Finally, after examining depositions Katz did not have the opportunity to see, his statements about the hospital's "outpatient" practices appear to be based on incorrect facts, as the hospital did not treat psychiatric patients in an "outpatient" manner.

{¶ 37} In addition to those opinions that Katz was clearly not qualified to make, an examination of his deposition demonstrates that he is not qualified to make other statements, which, on first blush, appear to be proper. For instance, he states that the hospital "failed to implement the proper standards to evaluate Timothy Wagner on a routine basis and did not effectively check his progress." As these statements relate to his experience as the medical director of psychiatric facilities, it appears that he would be qualified to render this opinion. However, an examination of his deposition demonstrates that he based this conclusion on facts not in the record, i.e., that Wagner was treating people on an outpatient basis that was approved by the hospital. Finally, many of Katz's statements appear to be crafted in such a way as to create some sort of duty on the part of

the hospital. This is, of course, improper, as the existence of a legal duty is a question of law, not of fact. *Laurent v. Flood Data Serv., Inc.* (2001), 146 Ohio App.3d 392, 400, 766 N.E.2d 221.

{¶ 38} For these reasons, we conclude that the trial court did not abuse its discretion when it struck Katz's affidavit. Many of the statements are improper legal conclusions, an attempt to create a legal duty, or opinions that Katz is not qualified to render.

{¶ 39} Accordingly, appellants' fifth assignment of error is without merit.

{¶ 40} In their remaining assignments of error, appellants challenge the trial court's decision to grant summary judgment to the hospital. When reviewing a trial court's granting of summary judgment, an appellate court applies the same standard used by the trial court. *Parenti v. Goodyear Tire & Rubber Co.* (1990), 66 Ohio App.3d 826, 829, 586 N.E.2d 1121. This court's review is, therefore, de novo. *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243. Under Civ.R. 56, summary judgment is only proper when the movant demonstrates that, viewing the evidence most strongly in favor of the nonmovant, reasonable minds must conclude that no genuine issue as to any material fact remains to be litigated and the moving party is entitled to judgment as a matter of law. Id. "[T]he moving party bears the initial responsibility of informing the trial court of the basis for motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact or material element of the nonmoving party's claim." *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 296, 662 N.E.2d 264. The nonmoving party has the reciprocal burden of specificity and cannot rest on mere allegations or denials in the pleadings. Id. at 293, 662 N.E.2d 264.

{¶ 41} In order to recover on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty, the defendant breached that duty, and the breach of the duty proximately caused the plaintiff's injury. *Chambers v. St. Mary's School* (1998), 82 Ohio St.3d 563, 565, 697 N.E.2d 198. Appellants argue that the trial court erred in granting summary judgment because the hospital negligently carried out the duties it owed to them. In response, the hospital argues that it owes them no duty; even if it did, it did not breach that duty; and even if it did, the breach was not the proximate cause of appellants' injuries.

{¶ 42} It is axiomatic that duty is an essential element of a cause of action for negligence. *Estates of Morgan v. Fairfield Family Counseling Ctr.* (1997), 77 Ohio St.3d 284, 293, 673 N.E.2d 1311. While the scope and extent of a duty is a question of fact, the existence of such a duty is a question of law. *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265. A duty may be established by common law, legislative enactment, or by the particular facts

and circumstances of the case. *Eisenhuth v. Moneyhon* (1954), 161 Ohio St. 367, 53 O.O. 274, 119 N.E.2d 440, paragraph one of the syllabus.

{¶ 43} Appellants' fourth assignment of error states:

{¶ 44} "The trial court committed prejudicial error and an abuse of discretion when it held that the defendant was granted summary judgment because there are genuine issues of material fact and issues of law as to whether defendant violated Ohio Revised Code 2151.421."

{¶ 45} Appellants argue that the hospital violated the provisions of R.C. 2151.421 and, therefore, should be liable to the Douglasses and the Pahanishes for Wagner's acts. R.C. 2151.421(A)(1)(a) provides persons, such as the ones employed at the hospital, who, acting in their official or professional capacity, know or suspect that a child under eighteen years of age has suffered or faces a threat of suffering any physical or mental wound, injury, disability, or condition of a nature that reasonably indicates abuse or neglect of the child, must immediately report that knowledge or suspicion to the public children services agency or a municipal or county peace officer in the county in which the child resides or in which the abuse or neglect is occurring or has occurred. Thus, each person listed in the statute has an independent obligation to report suspected abuse. Appellants argue that the hospital and its employees should have reported their suspicions of Wagner, especially after Kathy's phone call to Williams concerning whether S.K. should be allowed to spend time with Wagner.

{¶ 46} R.C. 2151.421 was enacted to safeguard children from abuse. *Brodie v. Summit Cty. Children Serv. Bd.* (1990), 51 Ohio St.3d 112, 119, 554 N.E.2d 1301. Thus, anyone who violates R.C. 2151.421(A)(1) is guilty of a misdemeanor of the fourth degree. R.C. 2151.99(A). R.C. 2151.421 sets forth a specific duty to report knowledge or suspicions of child abuse; thus, the failure to perform that duty is actionable and the plaintiffs bear the burden of showing that they fall within the class of individuals the statute was designed to protect. *Hite v. Brown* (1995), 100 Ohio App.3d 606, 617, 654 N.E.2d 452; *Curran v. Walsh Jesuit High School* (1995), 99 Ohio App.3d 696, 699, 651 N.E.2d 1028. The Ohio Supreme Court has held that the action required by R.C. 2151.421 is not directed at or designed to protect the public at large, but intended to protect a specific child who is reported as abused or neglected. *Brodie v. Summit Cty. Children Serv. Bd.*, 51 Ohio St.3d at 119, 554 N.E.2d 1301. Thus, R.C. 2151.421 imposes a duty that is owed solely to the minor child who the person responsible for reporting abuse knew or suspected was a victim of abuse or neglect. *Curran v. Walsh Jesuit High School*, 99 Ohio App.3d at 700, 651 N.E.2d 1028.

{¶ 47} The hospital did not have the statutory duty to report Wagner when he quit his employment. At that time, the hospital had no reason to know or suspect

that any particular child was being abused or in danger of being abused by Wagner. Therefore, the trial court properly granted summary judgment on this claim.

{¶ 48} Accordingly, appellants' fourth assignment of error is without merit.

{¶ 49} Appellants' third assignment of error states:

{¶ 50} "The trial court committed prejudicial error and an abuse of discretion when it held that the defendant was granted summary judgment because there are genuine issues of material fact as to plaintiff's claims that defendant was negligent in hiring Timothy Wagner as a counselor and permitting Timothy Wagner to counsel the minor Plaintiffs."

{¶ 51} "The party seeking to prevail on a claim for the negligent hiring, supervision and retention of an employee by an employer must show: (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries." (Internal citations and quotation marks omitted.) *Steppe v. Kmart Stores* (1999), 136 Ohio App.3d 454, 465, 737 N.E.2d 58.

{¶ 52} In this case, at the time appellants suffered their alleged injuries, an employment relationship did not exist between Wagner and the hospital. Additionally, there was no evidence to establish that prior to hiring Wagner, the hospital knew or should have known that Wagner was incompetent. Therefore, appellants failed to establish a claim of negligent hiring or retention.

{¶ 53} Accordingly, appellants' third assignment of error is without merit.

{¶ 54} Appellants' first and second assignments of error state respectively:

{¶ 55} "The trial court committed prejudicial error and an abuse of discretion when it held that the defendant was granted summary judgment because there are genuine issues of material fact that plaintiff's agents, John Lenzi, Karen Kazel, and Elizabeth Williams, were negligent [in a way] that caused the minor plaintiffs to be sexually molested by defendant's former counselor, Timothy Wagner. (Respondeat Superior.)"

{¶ 56} "The trial court committed prejudicial error and an abuse of discretion when it held that the defendant was granted summary judgment because there are genuine issues of material fact that it was foreseeable that Salem Community Hospital's counselor-child molester would molest other children, since Salem Community Hospital's agents failed to warn Douglass and Pahanish."

{¶ 57} The remainder of the duties that appellants argue the hospital allegedly breached arise out of the common law and the particular facts and circumstances

of the case. The essential question a court must answer when determining whether a duty exists is whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. *Morgan*, 77 Ohio St.3d at 297–298, 673 N.E.2d 1311. Appellants argue that the hospital owed various duties to them. For instance, they argue that the hospital had the duty to protect them from Wagner's actions. A duty to act affirmatively for another's aid or protection does not exist absent some "special relationship" between the parties that justifies the imposition of a duty. Id. at 293, 673 N.E.2d 1311, citing 2 Restatement of the Law 2d, Torts (1965) 116–130, Sections 314–319. Accordingly, appellants argue that a special relationship existed between themselves and the hospital.

{¶ 58} In *Evans v. Ohio State Univ.* (1996), 112 Ohio App.3d 724, 680 N.E.2d 161, the dissent in that case explained that exceptions can arise to the general rule of nonliability for the acts of third parties. It stated:

{¶ 59} "The other exception to the general rule of nonliability for the acts of third parties is that an actor owes a duty to exercise reasonable care to protect those with whom the actor has a special relationship from the conduct of third persons. See *Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.* (1989), 45 Ohio St.3d 171, 173–174, 543 N.E.2d 769, 772 (citing cases). Restatement of the Law 2d, Torts (1965) 122, Section 315, states the rule:

{¶ 60} " 'There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

{¶ 61} " '(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

{¶ 62} " '(b) *a special relation exists between the actor and the other which gives to the other a right to protection.*' (Emphasis added.)

{¶ 63} "Section 314A of the Restatement lists four specific 'special relationships' and the following caveat: 'The Institute expresses no opinion as to whether there may not be other relations which impose a similar duty.' The comments to Sections 314 and 314A express the same idea, that courts may recognize additional special relationships to expand the exception to the general rule:

{¶ 64} " 'The result of the [general] rule has been a series of older decisions to the effect that one human being, seeing a fellow man in dire peril, is under no legal obligation to aid him, but may sit on the dock, smoke his cigar, and watch the other drown. Such decisions have been condemned by legal writers as revolting to any moral sense, but thus far they remain the law. It appears inevitable that, sooner or later, such extreme cases of morally outrageous and indefensible conduct will arise that there will be further inroads upon the older rule.' Section 314 of the Restatement, Comment c, paragraph 3.

{¶ 65} " "* * * The relations listed are not intended to be exclusive, and are not necessarily the only ones in which a duty of affirmative action for the aid or protection of another may be found. * * * The question is therefore left open by the Caveat * * *. The law appears, however, to be working slowly toward a recognition of the duty to aid or protect in any relation of dependence or of mutual dependence.' Restatement, Section 314A, Comment b.

{¶ 66} "The trend has indeed been for courts to increase the number of instances in which a duty is imposed on the basis of special relationships. *Tarasoff v. Regents of Univ. of California* (1976) [17 Cal.3d 425], 131 Cal.Rptr. 14, 23, 551 P.2d 334, 343, fn. 5 (holding that when a psychological therapist determines that a patient presents a serious danger of violence to another, the therapist owes a duty of reasonable care to protect the intended victim). When imposed, the duty is only 'to exercise reasonable care under the circumstances.' Section 314A of the Restatement, Comment e.

{¶ 67} "Courts must consider all relevant circumstances when imposing duties:

{¶ 68} " "* * * There is no formula for ascertaining whether a duty exists. Duty "* * * is the court's 'expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' (Prosser, Law of Torts (4th ed.1971) pp. 325–326.) Any number of considerations may justify the imposition of duty in particular circumstances, including the guidance of history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall." ' (Citations omitted.) *Mussivand [v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265, 269–270]." *Evans v. Ohio State Univ.*, 112 Ohio App.3d at 753–754, 680 N.E.2d 161 (Lazarus, J., concurring and dissenting in part).

{¶ 69} In this case, there was such a special relationship between the hospital and appellants that when the inquiry was made about Wagner the hospital owed appellants the duty to warn them about him. Eric Douglass saw Wagner on a professional basis while Wagner was employed by the hospital. S.K.'s mother believed that S.K.'s visit with Wagner was to involve Wagner in some professional manner. When S.K.'s mother called the hospital to ask its advice on whether S.K. should accompany F.C. to Wagner's residence, her understanding was that she was given a positive reference about Wagner. She was not told about any suspicions about Wagner or that he was no longer employed at the hospital. While the hospital may not have had an affirmative duty to disclose to all former patients or clients that were involved with Wagner about his past history, when inquiry was made and it was asked for advice concerning him, it was bound to offer that advice in a non-negligent manner. In this instance, it clearly did not.

{¶ 70} Additionally, appellants have succeeded in making a more general claim of negligence pursuant to 2 Restatement of the Law 2d, Torts (1965), Section 323, negligent performance of an undertaking to render service, which states:

{¶ 71} "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

{¶ 72} "* * *

{¶ 73} "(b) the harm is suffered because of the other's reliance upon the undertaking."

{¶ 74} The theory of recovery under Section 323(b) is that "when one undertakes a duty voluntarily, and another reasonably relies on that undertaking, the volunteer is required to exercise ordinary care in completing the duty." *Kerr–Morris v. Equitable Real Estate Invest. Mgt., Inc.* (1999), 136 Ohio App.3d 331, 335, 736 N.E.2d 552. In other words, "[a] voluntary act, gratuitously undertaken, must be * * * performed with the exercise of due care under the circumstances." *Briere v. Lathrop Co.* (1970), 22 Ohio St.2d 166, 172, 51 O.O.2d 232, 258 N.E.2d 597. This theory of negligence does not require proof of a special relationship between the plaintiff and the defendant, or proof of somewhat overwhelming circumstances. This type of negligence follows the general rules for finding negligence, with the addition of one extra element of proof, that of reasonable reliance by the plaintiff on the actions of the defendant.

{¶ 75} One of the theories of recovery that appellants have set forth in their complaint is that Betsy Williams, the hospital's director of social services, gratuitously offered a recommendation to Kathy Pahanish, mother of S.K., regarding a former employee of the hospital, Wagner. Even if we accept the argument that Williams had no preexisting duty to protect Kathy Pahanish or her son, once Williams decided to give a recommendation about Wagner, she was required to exercise due care in giving the recommendation. Appellants believe that Williams did not exercise due care, resulting in injury to the minor children. These allegations mirror the elements of the tort of negligent performance of an undertaking to render service.

{¶ 76} The negligence action described in 2 Restatement of the Law 2d, Torts (1965), Section 323(b) has been recognized in Ohio. See *McMullen v. Ohio State Univ. Hosp.* (2000), 88 Ohio St.3d 332, 338, 725 N.E.2d 1117; *Brodie v. Summit Cty. Children Serv. Bd.* (1990), 51 Ohio St.3d 112, 115, 554 N.E.2d 1301.

{¶ 77} Accordingly, appellants' first two assignments of error have merit.

{¶ 78} The judgment of the trial court is hereby reversed in part and affirmed in part, and this matter is remanded for further proceedings according to law and consistent with this opinion.

Judgment reversed in part,
affirmed in part
and cause remanded.

WAITE, J., concurs.

DEGENARO, J., dissents.

DEGENARO, Judge, dissenting.

{¶ 79} I must disagree with the majority's resolution of this case because its conclusion regarding appellants' first and second assignments of error ignores a fundamental premise of negligence law. More specifically, it fails to recognize that because there is no genuine issue as to whether Wagner's acts were foreseeable to the hospital, the trial court properly granted summary judgment to the hospital on all of appellants' claims. Instead, the majority concludes that the hospital was not entitled to summary judgment on appellants' common-law negligence claims because a genuine issue exists regarding whether the hospital was in a special relationship with appellants and therefore had a duty to warn appellants about Wagner when S.K.'s mother called Williams regarding the children's visit to Wagner's residence. I find it unnecessary either to agree or disagree with this conclusion, since appellants have failed to demonstrate for the purposes of summary judgment that Wagner's acts were foreseeable to the hospital, and I would affirm the trial court's decision.

{¶ 80} The majority's opinion fails to mention that the existence of common-law duties generally depends upon the foreseeability of the injury. *Estates of Morgan v. Fairfield Family Counseling Ctr.* (1997), 77 Ohio St.3d 284, 293, 673 N.E.2d 1311. If the injury is not foreseeable, then whether a special relationship existed between the parties is immaterial because there would still be no duty to protect. Foreseeability is defined as whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act. Id. If a person can foresee neither any danger of direct injury nor any risk from an intervening cause resulting from his or her actions, then that person is simply not negligent. *Westfield Ins. Co. v. HULS Am., Inc.* (1998), 128 Ohio App.3d 270, 287, 714 N.E.2d 934. Thus, even if appellants establish a special relationship between themselves and the hospital, their claim against the hospital would fail if the injury is not foreseeable.

{¶ 81} In this case, appellants were injured by the criminal conduct of a third party. Generally, courts will not require the prudent person to expect the

criminal activity of others. *Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.* (1989), 45 Ohio St.3d 171, 174, 543 N.E.2d 769. But courts will hold a party liable for a third person's criminal conduct when the totality of the circumstances are "somewhat overwhelming" that the criminal conduct is foreseeable. See *Evans v. Ohio State Univ.* (1996), 112 Ohio App.3d 724, 742, 680 N.E.2d 161; *Reitz v. May Co. Dept. Stores* (1990), 66 Ohio App.3d 188, 193–194, 583 N.E.2d 1071. The foreseeability of a criminal act depends on the knowledge of the defendant, which must be determined by the totality of the circumstances. *Evans*, 112 Ohio App.3d at 742, 680 N.E.2d 161.

{¶ 82} *Evans* best illustrates the degree to which a third party's criminal act must be foreseeable before a defendant will be held liable. In *Evans*, a man, Waites, had been convicted of gross sexual imposition and corruption of a minor. After his release from prison, a county 4–H board hired him as a goat expert to be a speaker at pre-fair clinics and a judge at the 4–H fair. The state 4–H organization learned of his criminal history and informed the county 4–H board of its concerns. The county 4–H board continued to have Waites as a speaker after learning of the state organization's concerns but used him for the last time in the spring of 1991.

{¶ 83} In November 1991, the plaintiff's daughter joined 4–H. The daughter asked one of her 4–H advisors to recommend a person who could assist her with her goats and that advisor suggested Waites. When the advisor recommended Waites, the child had already seen him at two 4–H club meetings. That advisor did not know of Waites's previous convictions.

{¶ 84} During the spring of 1992, Waites would come over to the child's house "every so often" to help her with her goats. One day, Waites offered to take the child to get a goat. When he and the child reached his house, he molested her. He was subsequently tried and convicted of various counts of kidnapping, corruption of a minor, rape, and felonious sexual assault involving four minors.

{¶ 85} After she was molested, the child's mother proceeded to file a complaint against the county and state 4–H organizations, claiming failure to warn, negligent hiring, negligent retention, and negligent supervision. After a trial, the trial court entered judgment for the defendants. The appellate court affirmed that decision, finding that the totality of the circumstances demonstrated that Waites's actions were not foreseeable. It reasoned that Waites's duties as a judge and speaker and his degree of contact with children were limited, that the incident occurred over one year after Waites stopped working for the county 4–H organization, and that the assault did not occur at a 4–H event. "[W]e are unable to conclude that a duty of care extended to every member of 4–H who Waites may have come in contact with following his fair and clinic employment." Id. at 743, 680 N.E.2d 161. Thus, even though the county 4–H organization knew that

Waites had been convicted of gross sexual imposition and corruption of a minor, his actions were not foreseeable and the defendant could not be held liable under any theories of recovery. Id. at 749, 680 N.E.2d 161.

{¶ 86} This case presents this court with a situation in which it is even more difficult to conclude that the third party's conduct was somewhat overwhelmingly foreseeable than it was in *Evans*. In *Evans*, Waites had actually been convicted of gross sexual imposition and corruption of a minor before the local 4–H organization hired him as a speaker and a judge. See, also, *Doe v. Beach House Dev. Co.* (2000), 136 Ohio App.3d 573, 737 N.E.2d 141 (It was not foreseeable that a boy with an extensive history of delinquent conduct would sexually assault a younger boy); *Doe v. Blaney* (Dec. 29, 1995), 1st Dist. No. C–950093, 1995 WL 763623 (It was not foreseeable that a man with a history of alcohol problems who had been imprisoned for unspecified sexual contact with a seven-year-old female would molest a seven-year-old boy). Here, there had been allegations that Wagner had exposed himself and molested children and a police investigation into those allegations, but no conviction. Those allegations were made in 1987, eight years before S.K.'s mother called Williams. In that eight-year period, no one had made similar allegations against Wagner.

{¶ 87} Given the state of the law in Ohio, it is difficult to see how any court could find it somewhat overwhelmingly foreseeable that any person who is alleged to have molested children will do so in the future. This is best demonstrated by an examination of child custody and sexual predator law.

{¶ 88} Some parties have sought a change of custody based on allegations of sexual abuse in child custody cases. For example, in *Stover v. Plumley* (1996), 113 Ohio App.3d 839, 682 N.E.2d 683, a former husband sought custody of children from his former wife due to alleged sexual molestation by the former wife's current husband. The appellate court held that the unsubstantiated allegations of sexual abuse did not alone warrant a change of custody. Id. at 843, 682 N.E.2d 683. They are merely a factor a court could consider when deciding whether to change custody. Id. *Stover*'s rationale is significant in this case because of its rejection of the idea that allegations of sexual abuse toward children automatically mean that the alleged offender may be treated differently under the law. If an allegation of sexual abuse alone is not sufficient to keep a child away from an alleged offender, then how is it somewhat overwhelmingly foreseeable that someone will commit a criminal act in the future when they have only been the subject of a police investigation?

{¶ 89} This principle is most clearly demonstrated in Ohio's sexual predator laws. A sexual predator is defined as someone who has been *convicted* of a sexually oriented offense and is likely to engage.in the future in one or more sexually oriented offenses. R.C. 2950.01(E) and 2950.09(B)(3). A sexual preda-

tor classification must be based on more than the fact that the offender has been convicted of a sexually oriented offense. *State v. Eppinger* (2001), 91 Ohio St.3d 158, 743 N.E.2d 881. Thus, Ohio has rejected the idea that it is likely that an offender is likely to commit a second sexually oriented offense merely because they have been convicted of a first sexually oriented offense. If a conviction for a sexually oriented offense does not mean that the offender is likely to commit another sexually oriented offense in the future, then how can we hold that the hospital could foresee that Wagner would commit a sexually oriented offense because there were allegations that he had committed these sexually oriented offenses in the past? Accordingly, I would hold that a medical facility does not owe a duty to protect the public or its former patients from the criminal acts of former employees when it had only heard of allegations that the former employee had engaged in similar criminal acts in the past without additional facts and circumstances demonstrating that it was somewhat overwhelmingly foreseeable that the former employee would engage in those criminal acts.

{¶ 90} Given this conclusion, it is unnecessary to determine whether a special relationship existed between the hospital and appellants. Even if the hospital did have the type of special relationship with appellants necessary to create a duty to protect, since Wagner's criminal acts were not foreseeable the hospital could not have violated that duty. See *HULS Am.*, supra (if a person cannot foresee any danger of direct injury, then that person is simply not negligent). The majority ignores this fact when concluding that a duty to protect existed in this situation. It states that a special relationship existed and, therefore, the hospital had the duty to give its advice in a non-negligent manner. But the majority fails to explain how the evidence was somewhat overwhelming that Wagner's criminal conduct was foreseeable. Because the existence of a duty depends upon the foreseeability of the injury and Wagner's criminal conduct was not foreseeable, it is immaterial whether a special relationship existed between the hospital and appellants.

{¶ 91} I recognize the grievousness of the injuries appellants have suffered and understand their frustration with the hospital. But I cannot let the fact that appellants have suffered such severe injuries determine whether the hospital should be held liable for those injuries. In January 1992, it learned that Wagner was accused of some sexual misconduct in 1987, and soon thereafter Wagner no longer worked for the hospital. Wagner was never accused of any other sexual misconduct between 1987 and July 1995, when S.K.'s mother talked to Williams. Ohio law recognizes that an allegation of sexual misconduct does not mean that it is somewhat overwhelmingly foreseeable that someone will commit a criminal act conforming with those allegations. Because this type of criminal conduct is not foreseeable under these facts, the hospital did not owe appellants a duty to

protect them from Wagner. Because the hospital did not owe a duty to appellants, the trial court properly granted summary judgment to the hospital. Accordingly, I would find that appellants' assignments of error are all meritless and would affirm the trial court's judgment.