DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Plaintiff-Appellant, Hadi Chericki, executor of the estate of Ardeshir Cheriki, appeals the judgment of the Lorain County Court of Common Pleas that *Page 3 
granted summary judgment to Defendants-Appellees, Black River Industries, Inc. and Mark Serrano. We affirm.
 {¶ 2} In March 2005, Ardeshir Cheriki suffered a broken femur when he was struck by a tow motor operated by a coworker at Black River. At the time of the accident, Mr. Cheriki was employed by Kelly Services and assigned to Black River as a leased employee. On August 16, 2005, Mr. Cheriki died in his sleep from an apparent overdose of prescription medications including diazepam, oxazepam, and methadone. His maternal uncle, Hadi Cheriki, filed an action on behalf of Mr. Cheriki's estate against Kelly Services, Black River, and Mark Serrano. The complaint alleged assault, negligence, negligent supervision and/or negligent assignment, and with respect to Kelly Services, bad faith. The trial court granted summary judgment to Kelly Services on November 17, 2006, and to Black River and Mr. Serrano on July 18, 2007. This appeal followed.
 ASSIGNMENT OF ERROR "The trial court erred as a matter of law in entering a summary judgments [sic] against [Hadi Cheriki]."
 {¶ 3} The Estate's assignment of error is that the trial court erred in granting summary judgment to Black River and Mr. Serrano because genuine issues of fact remained for trial on its negligent supervision and intentional tort claims and the defendants were not entitled to judgment as a matter of law.
 SUMMARY JUDGMENT STANDARD *Page 4 {¶ 4} In reviewing a trial court's ruling on a motion for summary judgment, this Court applies the same standard a trial court is required to apply in the first instance: whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. Parenti v. Goodyear Tire Rubber Co. (1990),66 Ohio App.3d 826, 829. In applying this standard, evidence is construed in favor of the nonmoving party, and summary judgment is appropriate if reasonable minds could only conclude that judgment should be entered in favor of the movant. Horton v. Harwich Chem. Corp. (1995),73 Ohio St.3d 679, 686-87. Before the trial court may consider whether the moving party is entitled to judgment as a matter of law, however, it must determine whether there are genuine issues of material fact for trial.Byrd v. Smith, 110 Ohio St.3d 24, 2006-Ohio-3455, at ¶ 12.
 {¶ 5} The moving party "`bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims.'" Vahila v. Hall (1997), 77 Ohio St.3d 421, 429, quotingDresher v. Burt (1996), 75 Ohio St.3d 280, 293. The nonmoving party then has a reciprocal burden to set forth specific facts, by affidavit or as otherwise provided by Civ.R. 56(E), which demonstrate that there is a genuine issue for trial. Byrd at ¶ 10.
 EVIDENTIARY STANDARDS *Page 5 {¶ 6} Civ.R. 56(C) limits the evidence that may be considered in support of or in opposition to a motion for summary judgment to "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action[.]" Affidavits submitted under Civ.R. 56 "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit. Sworn or certified copies of all papers or parts of papers referred to in an affidavit shall be attached to or served with the affidavit." Civ.R. 56(E). Unauthenticated documents and affidavits not based on personal knowledge "have no evidentiary value and should not be considered by the court in deciding whether summary judgment is appropriate." Modon v. Cleveland (Dec. 22, 1999), 9th Dist. No. 2945-M, at *3. Nonetheless, this Court has held that unless the opposing party objects to the admissibility of improper evidence, the trial court "may, but need not" consider the evidence. Id., quoting Bowmer v.Dettlebach (1996), 109 Ohio App.3d 680, 684. See, also, State ex rel.The V Cos. v. Marshall (1998), 81 Ohio St.3d 467, 473-74.
 {¶ 7} Black River and Mr. Serrano each supported their motions for summary judgment by referencing Mr. Serrano's deposition and the deposition of Mr. Jeffrey Laird, a supervisory employee of Black River. In response to Black River's motion, the Estate pointed to the same depositions, as well as two expert reports that were unauthenticated and unqualified (Exhibits C and D); an *Page 6 
unauthenticated report of treatment by a medical professional and unauthenticated medical records (Exhibit D); and various unauthenticated documents that included internal accident reports from Black River and Kelly Services, additional medical records, and a record of employee discipline issued to Mr. Serrano (combined as Exhibits F, G, and H). In response to Mr. Serrano's motion, the Estate pointed to some of the same materials: the unauthenticated internal accident reports from Black River and Kelly Services and the record of employee discipline (Exhibit A). The Estate also referenced the affidavit of Mr. Cheriki's roommate, Mark Collier, which set forth hearsay statements that included the roommate's one-sided recollection of phone conversations that he overheard, and which was accompanied by numerous unauthenticated documents to which the roommate had no apparent connection (Exhibit B); the unauthenticated report of a legal investigator retained by the Estate's attorney (Exhibit C); the affidavit of Mr. Cheriki's uncle, Hadi Cheriki (Exhibit D); unauthenticated documents containing handwritten notes purporting to be made by the late Mr. Cheriki (Exhibit E); and copies of Mr. Cheriki's death certificate, the Coroner's verdict, and the autopsy report (Exhibit F).
 {¶ 8} Apart from the deposition transcripts of Mr. Serrano and Mr. Laird, the only evidence submitted by the Estate that complied with the evidentiary requirements of Civ.R. 56 is Exhibit F to the Estate's response to Mr. Serrano's motion for summary judgment: copies of Mr. Cheriki's death certificate, the Coroner's verdict, and the autopsy report, which are self-authenticating public *Page 7 
records. See Evid.R. 803(8). Of particular concern to this Court is Exhibit C to the Estate's response to Black River's motion for summary judgment, which purports to be the expert report of one Robert Reed. The Estate relied on this report in the trial court to demonstrate genuine issues of fact with respect to whether Mr. Cheriki's injury was substantially certain to occur and has reiterated this argument on appeal.
 {¶ 9} Expert affidavits and related documentation must comply with both Civ.R. 56(E) and Evid.R. 702 in order to be properly considered in opposition to a motion for summary judgment. See, e.g., Douglass v.Salem Community Hosp., 153 Ohio App.3d 350, 2003-Ohio-4006, ¶ 20-37. Specifically:
 "In order to comply with Civ.R. 56(E) and Evid.R. 702, an expert affidavit must set forth the expert's credentials and the facts supporting the expert's opinion which would be admissible into evidence. * * *
 "Ohio's standards regarding the admissibility of expert opinions are relatively lenient as to a determination of who is an expert but relatively strict in governing the admissibility of the expert testimony.
 "To qualify as an expert, the witness must have some `specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony'. An expert's testimony must either relate to matters beyond the knowledge or experience possessed by lay persons or dispel a misconception common among lay persons. `Neither special education nor certification is necessary to confer expert status upon a witness. The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function.' Finally, the witness is an expert only if his or her testimony `is based on reliable scientific, technical, or other specialized information.' When applying this prong of Evid.R. 702, the trial court acts as a `gatekeeper' to ensure *Page 8 
that the proffered information is sufficiently reliable." (Internal citations omitted.) Id. at ¶ 21, 31-32.
These requirements presume that an expert report submitted as evidence on summary judgment will be accompanied by an affidavit that sets forth the qualifications of the expert and the facts underlying the expert opinion. See id. at ¶ 21. In this case, we have no such affidavit. All that is known about Mr. Reed based on Exhibit C is that he claims an affiliation with "Reed Transportation Service Inc." in some capacity. His occupation, training, and field of expertise are unknown. The facts underlying his opinion are set forth generally, but only in his report in unverified form. Nonetheless, Exhibit C is the lynchpin of the Estate's argument in this appeal.[1]
 {¶ 10} Black River did not object to Mr. Reed's report or to any of the other evidence submitted by the Estate. The trial court appears to have considered Exhibit C, but determined it to be of limited relevance. Consequently, despite the fact that Exhibit C was not accompanied by an affidavit that complied with Civ.R. 56(E) and failed to set forth Mr. Reed's qualifications as required by Evid.R. 702, this Court considers it as well. Mr. Serrano moved to strike everything submitted in opposition to his motion for summary judgment except the coroner's materials, and the trial court granted his motion in full. With this in mind, our review-which *Page 9 
is de novo — includes all of the materials considered by the trial court in determining the motions for summary judgment.
 {¶ 11} Nevertheless, this Court expresses grave concern about the manner in which counsel for the Estate proceeded in the trial court. The requirements of Civ.R. 56 are not onerous. While a trial court may consider evidentiary materials that do not comply with Civ.R. 56, this practice should not be viewed as license to disregard the requirements of Civ.R. 56, as appears to have happened in this case. Noncompliance should be the exception rather than the rule.
 MR. SERRANO'S MOTION FOR SUMMARY JUDGMENT {¶ 12} The Estate maintains that it is challenging the trial court's order with respect to Black River and Mr. Serrano. Its brief, however, does not contain any arguments or references to the record that relate to the trial court's decision granting summary judgment to Mr. Serrano. "It is the duty of the appellant, not this court, to demonstrate his assigned error through an argument that is supported by citations to legal authority and facts in the record." State v. Taylor (Feb. 9, 1999), 9th Dist. No. 2783-M, at *3. Because the Estate has failed to argue error with respect to Mr. Serrano, this Court's review is confined to the trial court's decision granting summary judgment to Black River.
 BLACK RIVER'S MOTION FOR SUMMARY JUDGMENT *Page 10 {¶ 13} The Estate's first argument is that the trial court erred by granting summary judgment to Black River on its claim for negligent supervision because, according the Estate, Black River did not move for summary judgment on that claim. A review of Black River's motion for summary judgment, however, indicates that Black River specifically argued that it was immune from the Estate's negligence claim pursuant to R.C. 4123.74.
 {¶ l4} In support of its motion for summary judgment on this claim, Black River pointed to evidence from the depositions of Mark Serrano and Jeffrey Laird demonstrating that although Mr. Cheriki was an employee of Kelly Services, his work was controlled by Black River. The Estate did not dispute Black River's position in this respect and, therefore, failed to demonstrate that a genuine issue of fact remained for trial on the issue of Black River's control over the conditions of Mr. Cheriki's work.
 {¶ 15} Black River maintained that it was entitled to judgment as a matter of law on the claim of negligent supervision because, despite the fact that Kelly Services contributed to the workers' compensation fund with respect to Mr. Cheriki's employment, Black River was the employer for purposes of the immunity from suit conferred by R.C. 4123.74. Instead of responding to Black River's argument, the Estate maintained that it is entitled to judgment on the merits of its negligent supervision claim. The Estate reiterates this position on appeal. *Page 11 
 {¶ l6} The Ohio workers compensation system provides the exclusive remedy to employees injured in the course and scope of their employment:
 "Employers who comply with section 4123.35 of the Revised Code shall not be liable to respond in damages at common law or by statute for any injury, or occupational disease, or bodily condition, received or contracted by any employee in the course of or arising out of his employment, or for any death resulting from such injury, occupational disease, or bodily condition occurring during the period covered by such premium so paid into the state insurance fund, or during the interval the employer is a self-insuring employer, whether or not such injury, occupational disease, bodily condition, or death is compensable under this chapter." R.C. 4123.74.
The Estate claimed that Black River negligently supervised Mr. Serrano and that the negligent supervision resulted in Mr. Cheriki's injury and subsequent death. Consequently, this suit is barred by R.C. 4123.74
provided that Black River is the "employer" for purposes of that statute.
 {¶ 17} When a customer of a temporary agency retains the ability to control the manner and means of the work performed by leased employees, it is the customer — rather than the employment agency — that enjoys the benefit of the immunity conferred by R.C. 4123.74. Daniels v. MacGregorCo. (1965), 2 Ohio St.2d 89, 92-93, citing Bobik v. Indus. Comm. (1946),146 Ohio St. 187; Smith v. Lindsay Excavating Concrete, 5th Dist. No. 2003CA00283, 2004-Ohio-986, at ¶ 48.
 {¶ 18} It appears from the record that there was no distinction with respect to working conditions between persons employed by Black River and those leased from Kelly Services. Mr. Cheriki received orientation, training, and supervision *Page 12 
from Black River, and Black River determined his schedule and working conditions. There is no evidence in the record suggesting an agreement to the contrary between Black River and Kelly Services, nor does the record indicate that Kelly Services played any role in controlling the manner and means of the work done by leased employees. Consequently, Black River enjoys the benefit of the immunity conferred by R.C.4123.74, and the trial court did not err by granting summary judgment to Black River on the Estate's claim for negligent supervision.
 {¶ 19} The Estate's second argument is that the trial court erred by granting summary judgment to Black River on its claim, captioned "assault," in which the Estate maintained that Black River's "reckless conduct" resulted in Mr. Cheriki's death. This Court notes that the element of causation between Mr. Cheriki's injury and death by drug overdose is questionable at best. In its brief, however, Black River has responded to the Estate's assignment of error as an employer intentional tort but has not reiterated its arguments regarding causation from the trial court, and we proceed accordingly.
 {¶ 20} An employer may be liable in tort for injuries to an employee when the employer knew that a dangerous process, procedure, instrumentality or condition existed which was substantially certain to cause injury to the employee, but required the employee to perform the task regardless. Fyffe v. Jeno % Inc. (1991), 59 Ohio St.3d 115, paragraph one of the syllabus.
 {¶ 21} A plaintiff alleging injury resulting from a tortious action by an employer must establish: "(1) knowledge by the employer of the existence of a *Page 13 
dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Fyffe, 59 Ohio St. 3d at paragraph one of the syllabus.[2] Because the Fyffe test is conjunctive, a failure of proof on one element renders discussion of the remaining elements moot. See Harris v. Bekaert Corp., 9th Dis. No. 05CA0056, 2006-Ohio-1487, at ¶ 14. Summary judgment can therefore be granted to an employer when there is no genuine issue of material fact with respect to one element and, with respect to that element, the employer is entitled to judgment as a matter of law. See id., citingPintur v. Republic Technologies Internatl, LLC, 9th Dist. No. 05CA008656, 2005-Ohio-6220, at ¶ 11.
 {¶ 22} In order to establish an intentional tort by an employer, proof beyond negligence and recklessness is required, but as the probability of harm increases to the point of substantial certainty, the law infers intent to produce the result. Fyffe, *Page 14 
59 Ohio St.3d at paragraph two of the syllabus. This court has held that it is the element of substantial certainty that differentiates negligence from an intentional tort. Marks v. Goodwill Industries ofAkron, Ohio, Inc. (Mar. 27, 2002), 9th Dist. No. 20706, at *2, citingVan Fossen v. Babcock Wilcox Co. (1988), 36 Ohio St.3d 100, 116. "The line must be drawn where the known danger ceases to be a foreseeable risk which a reasonable person would avoid, and becomes in the mind of the [employer] a substantial certainty." (Quotations omitted.)Marks at *2.
 {¶ 23} In support of its motion for summary judgment, Black River referenced the depositions of Jeffrey Laird and Mark Serrano. Mr. Laird, who has been employed by Black River since January 2004, held secondary responsibility for supervising Mr. Cheriki and Mr. Serrano. He testified that his job also involved preparation of manuals describing the procedures used in the facility and that instruction regarding the proper use of tow motors appears "in almost all of the procedural manuals." He also stated that copies of the manuals are available by each production line and in the company office and break room. Mr. Laird demonstrated general familiarity with OSHA requirements and testified that Black River had not been inspected by OSHA during his tenure. He stated that he was not aware that OSHA required a fifteen-foot aisle width for operating a tow motor, a "license" for tow motor operators, or the presence of a supervisor on every shift. Mr. Laird confirmed that, according to his understanding, OSHA requires tow *Page 15 
motors to be equipped with working horns, "trained and certified operators," and that operators cannot "drive forward if their visibility is impaired." With respect to specific speeds of operation and load heights, Mr. Laird testified that the parameters of safe operation depend on the circumstances:
 "Safe speed is quantified in the context of what's happening in the situation. If they are carrying a load that's very tall and very precarious, say the speed might be very, very slow. If they're carrying a single pallet through the back of an abandoned warehouse, it might be faster, but there's no — there is no way to write something down or even communicate something person-to-person that covers every single circumstance, so we tell them that they need to operate at a safe rate of speed. Slower is usually better."
He acknowledged that Black River's warehouse did not have painted lanes of operation or designated pedestrian paths to and from restroom facilities, but explained that "there are pretty well-defined locations where tow motors operate."
 {¶ 24} When Mr. Serrano was hired by Black River, Mr. Laird assessed his ability to operate a tow motor:
 "I expressed to him our expectations for safety. I had conversations with him about his comfort level with tow motors. I observed him operating a lift truck to get a feeling for how capable and familiar he was with the operation. Based on what I saw, I was comfortable that what he had told us and what Kelly [Services] had told us about his prior experience was accurate."
Mr. Laird recalled that Mr. Serrano "described the training that he had gone through at other locations [and] * * * demonstrated that he had a knowledge of what was going on." Mr. Laird testified that he was aware that OSHA required *Page 16 
certification in order to operate a tow motor and recalled that he was certain, considering OSHA's requirements for periodic certification and Mr. Serrano's prior experience and training, that "he was qualified to operate the tow motor."
 {¶ 25} Mr. Laird scheduled Mr. Serrano and Mr. Cheriki to work the second shift together on the date of the accident. He recalled that they were the only two employees scheduled for that shift and stated that he did not witness the incident. He arrived at the facility after receiving a call from Mr. Serrano and, by that time, Mr. Cheriki had already been transported to the hospital. Mr. Laird testified that he could not determine how the accident occurred with certainty: "The way it was described to me, the thought that I had when I filled [the incident report] out is either Mark was driving too quickly or Art had walked out into the aisle without looking, or both at the [same] time. I didn't have a good way to know." Mr. Laird testified that this was the only tow motor accident to have occurred at Black River.
 {¶ 26} Mr. Serrano, who is the only surviving witness to the accident, testified that he has had experience operating tow motors in at least four of his previous jobs and had done so, at times, on a daily basis. He estimated that the total number of occasions on which he had operated a tow motor "could be hundreds, could be thousands." He also testified that he had never been reprimanded for unsafe operation and summarized his understanding of the speed at which a tow motor can be operated safely to be when "[y]ou're able to see everything clearly, you're able to turn when you want, how you want, you can *Page 17 
move your load without worrying about it shifting or falling or things of that nature."
 {¶ 27} Mr. Serrano characterized the events of that evening as "an absolute accident":
 "Close to 10:30, I had drove [sic] towards the front of the building to pick up material. Art was then on my right side standing by the end of the wash line. I went down around the corner, picked the stack of material up and was on my way back.
 "Heading forward looking to my left now, because Art should be on my left, the time frame was no more than 30 seconds it took me to round the corner, pick a piece up and come back around. I'm heading back towards the grinder looking to my left, because that's where he was when I last seen him, felt something hit, looked to the right, looked back to the left and he was on the ground.
 "I immediately stopped, got off my tow motor and approached him and asked him where did he come from, and he told me he came from the bathroom. I said, `Art, are you hurt?' He said, `It's my leg,' and I said, `Do you want me to call an ambulance?' He said, `Yeah.'"
Mr. Serrano recalled that his tow motor was loaded with plastic lids that were not strapped down and that the load was approximately the same width as the tow motor itself. He testified that the load was not disturbed by the impact of the accident. Mr. Serrano stated that he did not feel that the tow motor he was operating on the night of the accident was unsafe and testified that, in his opinion, neither a horn nor a light could have prevented the accident. According to his testimony, the lighting in the warehouse was "adequate" — "It wasn't bright, it wasn't dim" and although he was wearing ear plugs at the time of the accident, he felt that he could have heard Mr. Cheriki if he had screamed prior to the impact. *Page 18 
 {¶ 28} As noted above, the Estate relies almost entirely on Robert Reed's "expert" report to establish that there are genuine issues for trial with respect to Black River's intent. Mr. Reed noted several conditions that he considered to be safety violations based on an inspection of the facility after-the-fact and his review of the depositions taken in this case. Mr. Reed concluded that Black River failed to provide a safe workplace for its employees. He did not state that an accident such as the one that injured Mr. Cheriki was substantially certain to occur, but that "if a pedestrian worker was struck by a 7800lb + towmotor/forklift * * * injuries or death are substantially certain to occur." (Emphasis added.)
 {¶ 29} Exposure to conditions or processes that are dangerous — even unusually so — is insufficient in itself to establish substantial certainty of injury. Delnoce v. Bridgestone/Firestone, Inc. (Feb. 9, 1999), 9th Dist. No. 18883, at *4. Consequently, when determining intent, "this Court proceeds on a case-by-case basis and considers the totality of the circumstances." Marks at *2. Concerning substantial certainty, we have stated that:
 "Some of the relevant facts and circumstances which support the conclusion that an employer's knowledge that harm to the employee was a substantial certainty include, but are not limited to: prior acts of a similar nature, the employer's concealment or misrepresentations concerning the danger, and federal and/or state safety violations or noncompliance by the employer with industry safety standards." Id.
Failure to implement safety procedures is one circumstance relevant to the issue of intent but is not determinative in and of itself. See, e.g., Adkins v. Atom Blasting Finishing Inc., 9th Dist. No. 07CA009109, 2007-Ohio-5100, at ¶ 12-17. In *Page 19 Adkins, for example, the appellant argued that summary judgment was improperly granted to the employer based on expert opinion that the employer's compliance with OSHA regulations was "minimal." Id. at ¶ 13. The expert also expressed the opinion that the employer was "well aware" of the dangers present on its worksite and failed to take appropriate steps to minimize the danger. Id. This Court concluded that the employer's general appreciation of the risk was not tantamount to substantial certainty that harm would result. Id. at ¶ 17.
 {¶ 30} Viewing the evidence in the light most favorable to the Estate, it may be that Black River appreciated the risk of injury from unsafe operation of a tow motor. It is undisputed that Mr. Serrano was operating a tow motor that lacked a working light and horn and that Black River did not have painted lines that designated the area of operation. It is also undisputed, however, that Mr. Serrano is an experienced tow motor operator with an unblemished safety record; that Black River had never experienced an incident of this nature before; and that both Mr. Serrano and Mr. Laird articulated an awareness of the need to operate a tow motor safely. Black River's appreciation of the risk in this case does not rise to the level of substantial certainty required by Fyffe, and the trial court did not err in granting summary judgment to Black River. *Page 20 
 {¶ 31} The Estate's assignment of error is overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
DICKINSON, J., CONCURS
[1] This Court has similar concerns about the purported expert report of Dr. Bijan Bastani, also submitted in support of the Estate's response to Black River's motion for summary judgment as Exhibit D. Like Mr. Reed's report, Dr. Bastani's report was not accompanied by an affidavit that set forth his qualifications as an expert and the facts underlying his opinion.
[2] R.C. 2745.01, which was amended effective April 7, 2005, provides that "`substantially certain' means that an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death." This measure of substantial certainty is more restrictive than the standard set forth by the Supreme Court inFyffe and its progeny. Mr. Cheriki was injured on March 29, 2005, and died in his sleep on August 16, 2005, of an accidental drug overdose. We need not address the applicability of R.C. 2745.01 because we conclude that summary judgment was proper even under the less demanding standard set forth in Fyffe.