WAGNER et al., Appellants,

v.

OHIO STATE UNIVERSITY MEDICAL CENTER et al., Appellees.

[Cite as *Wagner v. Ohio State Univ. Med. Ctr.,* 188 Ohio App.3d 65, 2010-Ohio-2561.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 09AP–1031.

Decided June 8, 2010.

66

Robert Gray Palmer Co., L.P.A., and Robert G. Palmer, for appellants.

Richard Cordray, Attorney General, and Karl W. Schedler, Assistant Attorney General, for appellees.

---

TYACK, Presiding Judge.

{¶ 1} Plaintiff-appellant John T. Wagner brought a negligence action in the Court of Claims of Ohio against defendant-appellee the Ohio State University Medical Center ("OSU"). OSU moved for summary judgment, and after briefing, the trial court heard oral argument. The Court of Claims granted summary judgment in favor of OSU, and Wagner appealed.

{¶ 2} Because this is an appeal from a summary judgment, our review is de novo, and we construe the following facts in the light most favorable to Wagner. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241; Civ.R. 56(C).

{¶ 3} Wagner suffers from chronic pancreatitis, a condition that causes him extreme pain. Wagner first met Dr. G. Todd Schulte when he was in his residency at the OSU Pain Clinic. In January 2000, Schulte, an anesthesiologist, surgically implanted a morphine pump into Wagner. The pump relieved Wagner's unrelenting pain, and his quality of life improved dramatically.

{¶ 4} In 2002, OSU hired Schulte as a physician and as a faculty member/researcher. During his entire employment with OSU, Schulte was a chemically impaired physician practicing under a consent agreement with the State of Ohio Medical Board.

{¶ 5} Wagner continued to treat with Schulte at the OSU Pain Clinic. In early 2002, Schulte and Wagner discussed Schulte's desire to do research into what Schulte called "pain markers," and Schulte suggested that Wagner could be a

participant in the research. Wagner was willing to do so in order to benefit others in chronic pain.

{¶ 6} Wagner developed a "father-son" type of relationship with Schulte. In addition, Wagner also developed a close relationship with OSU Pain Clinic staff, physicians, and other patients. Wagner was asked by Schulte and other OSU physicians to counsel fellow pain-clinic patients on dealing with their morphine pumps and other pain treatments. Wagner wrote proposals for an OSU Pain Patient Support Group, which he was to head. OSU Pain Clinic personnel were well aware of the close relationship between Wagner and Schulte.

{¶ 7} In July 2004, Wagner accompanied Schulte to a meeting with Dr. Michael B. Howie, Chair of OSU's Department of Anesthesia, and Schulte's chairman and ultimate supervisor. Wagner was there to lend support for Schulte's problem in obtaining renewal of malpractice insurance: a problem that Schulte attributed to a conflict with another physician. Schulte appeared very sleepy at that meeting, but Dr. Howie never suggested then or at any later time to Wagner that Schulte was an impaired physician due to drugs. Much later, Schulte admitted that he had access to his mother's morphine after she died and that he had taken her morphine that day.

{¶ 8} Schulte had several conversations with Dr. Howie and other OSU physicians concerning his impairment or appearance of impairment. A patient complained that he thought Schulte had taken his Dilaudid on one occasion. Schulte was asked to provide a urine sample, and the sample was negative. Schulte later admitted that the doctor who was monitoring Schulte's urine tests would sit at a desk and fill out paperwork while Schulte went into the bathroom to provide the sample. Schulte substituted concealed clean urine in place of his own urine. This led to his testing negative for drugs at that time, although he later tested positive for morphine on September 24, 2004.

{¶ 9} Schulte testified by way of deposition that he had been sent home from work on several occasions by Dr. Severyn, who made the determination that Schulte was not fit to treat patients at the OSU Pain Clinic on those days. A registered nurse wrote a memo to Dr. Severyn in early July 2004. The memo detailed an incident in which it appeared that Schulte had removed 3 ml. of Dilaudid from a syringe used during a pump-refill procedure. In August and September 2004, several nurses and Dr. Severyn made written reports about Schulte's condition. Schulte's lethargy, slurred speech, somnolence, rambling and inconsistent statements, and inability to function are well documented in those letters and memoranda.

{¶ 10} Eventually, in September 2004, OSU removed Schulte from patient care at the Pain Clinic and placed him on administrative leave. Schulte was referred for evaluation to the Cleveland Clinic in-patient program on October 4, 2004.

{¶ 11} On November 12, 2004, the Medical Board suspended Schulte's license to practice medicine for an indefinite period of not less than one year. OSU then revoked Schulte's clinical and hospital privileges and terminated his contract as a clinical physician. OSU did not communicate any of this information to Wagner. On November 15, Wagner was seen at the OSU Pain Clinic by another physician who was not his usual treating physician. When asked, that physician told Wagner that she did not know where Schulte was.

{¶ 12} OSU retained Schulte in his paid faculty/researcher position until January 21, 2005. OSU asserts that this was to allow Schulte to retain his health insurance. He kept his pager, ID badges, and computer password, which gave him access to OSU facilities, equipment, and computers.

{¶ 13} On December 12, 2004, Schulte wrote to Department Chair Dr. Howie, asking for the opportunity to do medical research within the department of anesthesiology. Schulte also had an in-person conversation with Dr. Howie in December 2004 in which Dr. Howie approved of Schulte's continuing with ongoing research. OSU takes the position that Schulte never had permission to conduct any research after his license was revoked, and there were no ongoing research projects available to him.

{¶ 14} On January 3, 2005, Dr. Severyn wrote a memo detailing an incident in which a nurse discovered that Schulte had withdrawn Dilaudid from the pain pump of an OSU patient, Tom Schulte, Schulte's father. Additionally, Dr. Severyn discovered that Schulte possessed a pump-programming unit and that he had been manipulating the dosage of pain medication that his father received. None of this information was conveyed to Wagner, who had a similar father-son type of relationship with Schulte.

{¶ 15} On January 12, 2005, Schulte telephoned Wagner to ask whether he could withdraw a spinal-fluid sample from his pain pump as part of Schulte's research into pain markers. Wagner agreed, and Schulte went to Wagner's home dressed in OSU scrubs and carrying a medical kit. Instead of withdrawing a spinal-fluid sample, Schulte used a needle and syringe to withdraw the morphine from Wagner's pump. Schulte then used the morphine to feed his own drug habit.

{¶ 16} Within a matter of eight hours, Wagner began to experience pain like that of a pancreatitis attack. He was admitted to the hospital, but his pain was not under control when he was discharged.

{¶ 17} Six days after Schulte took Wagner's morphine from his pump, Schulte went to the home of another trusting patient, Jesse Persinger, where he again siphoned morphine from the patient's pain pump.

{¶ 18} On January 24, 2005, Wagner's home nurse arrived for a regularly scheduled appointment to refill his pain pump. She withdrew an orange colored fluid from the pump and replaced it with morphine. She asked Wagner whether he had seen Schulte recently, and Wagner replied that he had. The nurse notified OSU and had him report to the hospital. Wagner remained hospitalized until February 7, 2005.

{¶ 19} Wagner was treated for a bacterial infection caused by Schulte's procedure. Wagner's pump had to be surgically removed, and he was placed on oral and patch pain medications that were less effective at controlling his pain. A new pain pump could not be implanted until Wagner was fully recovered from his bacterial infection. On August 10, 2005, Dr. Severyn implanted a new pump for Wagner.

{¶ 20} Schulte ultimately pleaded guilty to criminal charges for his conduct, and he was given a prison sentence.

{¶ 21} On appeal from the decision of the Court of Claims of Ohio granting summary judgment for OSU, Wagner raises a single assignment of error, asserting that the Court of Claims incorrectly granted summary judgment in favor of OSU on his negligence claims.

{¶ 22} To survive a properly supported motion for summary judgment in a negligence action for the injury to Wagner, Wagner must establish that genuine issues of material fact exist as to whether OSU owed him a duty, that OSU breached that duty, and that the breach was a proximate cause of the injury. *Albright v. Univ. of Toledo* (Sept. 18, 2001), 10th Dist. No. 01AP–130, 2001 WL 1084461; *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265. The existence of a duty in a negligence action is a question of law for the court to determine. Id. Whether a defendant owes a plaintiff a duty in a negligence case is a fundamental aspect of establishing actionable negligence, and if there is no duty or obligation of care, no legal liability may arise for the negligent act. *Albright* at *2, citing *Jeffers v. Olexo* (1989), 43 Ohio St.3d 140, 142, 539 N.E.2d 614.

{¶ 23} This court clarified the issue of duty in a negligent-retention case in *Abrams v. Worthington*, 169 Ohio App.3d 94, 2006-Ohio-5516, 861 N.E.2d 920. The existence of a duty will depend on the foreseeability of the injury to the plaintiff. Id. at ¶ 15. The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act. Id. " 'The foreseeability of a criminal act depends upon the knowledge of the defendant, which must be determined by the totality of the circumstances, and it is only when the totality of the circumstances are "somewhat overwhelming" that the defendant will be held

liable.' " *Staten v. Ohio Exterminating Co., Inc.* (1997), 123 Ohio App.3d 526, 530, 704 N.E.2d 621, quoting *Evans v. Ohio State Univ.* (1996), 112 Ohio App.3d 724, 742, 680 N.E.2d 161, citing *Feichtner v. Cleveland* (1994), 95 Ohio App.3d 388, 396, 642 N.E.2d 657. Thus, whether OSU owed Wagner a duty turns on whether a reasonably prudent person would have anticipated that Wagner would be injured by way of OSU's alleged negligence.

{¶ 24} Even if an injury is foreseeable, there may not be a duty to act. *Abrams* at ¶ 16. The general rule is that a defendant has no duty to protect a plaintiff from or to control the conduct of a third person. Id. However, a duty will arise if the defendant shares a special relationship with the plaintiff or a third person that justifies the imposition of the duty. Id. That relationship may include an employer and employee relationship. Id.

{¶ 25} "Concerning criminal acts of a third party which the defendant might reasonably anticipate, 'the mere fact that misconduct on the part of another might be foreseen is not of itself sufficient to place the responsibility upon the defendant.' Prosser & Keeton, [Law of Torts (5 Ed.1984)] at 305. Rather, '[i]t is only where misconduct was to be anticipated, and taking the risk of it was unreasonable, that liability will be imposed for consequences to which such intervening acts contributed.' Id. at 313." *Evans,* 112 Ohio App.3d at 740, 680 N.E.2d 161.

{¶ 26} Ohio courts recognize the tort of negligent retention. When defining the conduct these torts make actionable, this court has relied upon the Restatement of the Law 2d, Agency (1958) Section 213, which states:

A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
* * *

(b) in the employment of improper persons or instrumentalities in work involving risk of harm to others.

See *Groner v. deLevie* (May 1, 2001), 10th Dist. No. 00AP–1244, 2001 WL 438701; *Staten,* 123 Ohio App.3d at 528–529, 704 N.E.2d 621; *Evans* at 739, 680 N.E.2d 161. See also the Restatement of the Law 2d, Agency (2006) Section 7.05(1) ("A principal who conducts an activity through an agent is subject to liability for harm to a third party caused by the agent's conduct if the harm was caused by the principal's negligence in selecting, training, retaining, supervising, or otherwise controlling the agent").

{¶ 27} In this case, the key inquiry is whether OSU owed a duty to protect Wagner and Schulte's other patients with pain pumps whether they were at OSU or in their homes. Wagner asserts that a simple letter warning Schulte's

former pain-pump patients would have protected him from the tortious and criminal acts of Schulte.

█ {¶ 28} Liability for negligent retention arises because the employer chooses to retain an employee who has a history of criminal, tortious, or otherwise dangerous conduct about which the employer knew or could have discovered through reasonable investigation. See *Byrd v. Faber* (1991), 57 Ohio St.3d 56, 61, 565 N.E.2d 584.

█ {¶ 29} The elements for a claim of negligent retention are as follows:
(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in * * * retaining the employee is the proximate cause of the plaintiff's injuries.

*Evans*, 112 Ohio App.3d at 739, 680 N.E.2d 161.

{¶ 30} Wagner responded to the summary-judgment motion by presenting evidence that at the time Schulte harmed Wagner, OSU had retained Schulte as a faculty researcher despite actual knowledge that Schulte was actively pursuing his addiction to opiates. OSU also had actual knowledge that Schulte had fed his addiction by siphoning pain-pump medication from his own father, an OSU Pain Clinic patient. OSU also knew that Schulte possessed a device with which he could reprogram the pain pumps of OSU patients. Wagner asserts that OSU had a duty to protect him from the criminal and tortious acts of Schulte based on the foreseeability of his actions and the special relationships that existed between Schulte and OSU and Wagner and OSU. Wagner further claims that by retaining Schulte as a faculty researcher and allowing him computer access and access to equipment, and allowing him to keep his ID cards and pager, OSU clothed Schulte with apparent authority that allowed Schulte to access Wagner's pain pump under the guise of doing research, to perpetrate a fraud and to injure Wagner.

{¶ 31} With respect to foreseeability, reasonable minds can differ as to whether the injury to Wagner was foreseeable. OSU knew of Wagner's trust in Schulte. OSU was fully aware that Schulte was abusing drugs throughout 2004. On January 3, 2005, OSU physicians, including the department chair, discussed and documented Schulte's behavior in withdrawing pain medication from an OSU patient in that patient's home. OSU also knew that Schulte had been manipulating a patient's pain pump while in his home with a programming device that Schulte had obtained from OSU.

{¶ 32} OSU contends that just because Schulte siphoned pain medication from his father, it does not automatically follow that Schulte would siphon pain

medication from Wagner. OSU also argues that even if Schulte had not been employed by OSU, the event would have still happened due to the close relationship between Wagner and Schulte.

{¶ 33} However, Wagner contends that in light of Schulte's history of drug abuse (including manipulating his father's pain pump), the close father-son relationship that developed between Wagner and Schulte, the fact that Schulte contacted his department head seeking to do research into pain markers, and in light of Wagner's close relationship with the OSU Pain Clinic, including Wagner's efforts to advance the cause of pain management, it was apparent to OSU that Schulte might access Wagner's morphine in the same manner in which he treated his own dying father.

{¶ 34} In addition, after OSU had removed Schulte from his clinical duties due to drug abuse, OSU was evasive when Wagner inquired as to Schulte's where-abouts, even though Schulte had been removed from his clinical duties and referred to the Cleveland Clinic for in-patient evaluation. In *Douglass v. Salem Community Hosp.*, 153 Ohio App.3d 350, 2003-Ohio-4006, 794 N.E.2d 107, ¶ 69, the court held that a special relationship arose once a person inquires about a former employee and the hospital responds. *Douglass* involved a former employ-ee who resigned because of a past history of child molestation. The inquiry was whether a mother's child should accompany his cousin for a weekend stay at the former employee's home. The mother was not told about its suspicions about the former employee or even that the employee was no longer employed. The court stated, "While the hospital may not have had an affirmative duty to disclose to all former patients or clients that were involved with [the former employee] about his past history, when inquiry was made and it was asked for advice concerning him, it was bound to offer that advice in a non-negligent manner." Id. at ¶ 69.

{¶ 35} OSU did take action to remove Schulte from treating patients at the pain clinic; however, OSU did nothing to warn those patients who might encounter Schulte in their homes. Home health visits were an integral part of the patient care OSU provided for its pain-pump patients. OSU did not communicate to Wagner that Schulte had lost his medical license and had been placed on administrative leave with no research duties because of his continued abuse of pain killers. This allowed Schulte to clothe himself as an authorized OSU researcher in order to gain access to pain medication. Furthermore, an issue of material fact exists as to whether Schulte was permitted to conduct research after losing his clinical duties. If he was permitted to conduct research, OSU would have an even greater responsibility to patients such as Wagner, who had volunteered to be part of pain research.

{¶ 36} Construing these facts in the light most favorable to Wagner, we find that a genuine issue of material fact exists as to whether Schulte's actions were a

reasonably foreseeable consequence of OSU's decision to retain Schulte in a faculty/researcher position at OSU. OSU, knowing of Schulte's misconduct towards his father, should have reasonably foreseen the likelihood that its employee might engage in such actions with another well-known patient who had developed a father-son type of relationship with Schulte. The existence of a special relationship as explained in *Abrams*, coupled with the foreseeability of the injury and the decision to avoid informing Wagner as to Schulte's whereabouts in a drug program, creates a genuine issue of material fact as to whether OSU had a duty to protect Wagner from such harm.

{¶ 37} We recognize that factual disputes remain as to the credibility of witnesses and whether and how certain events took place. Summary judgment is not the vehicle for weighing the evidence or determining witness credibility. Only trial on the merits can resolve such disputes. While the question of the existence of a duty is a question of law, the resolution of that question must await the resolution of the factual disputes concerning foreseeability.

{¶ 38} Wagner asserted another theory of liability under an agency theory. Wagner contends that OSU is vicariously liable for Schulte's tortious acts because OSU put Schulte in position as a faculty member entitled to conduct research. This enabled Schulte, while apparently acting within his authority, to misrepresent that he was withdrawing a sample of spinal fluid from Wagner's morphine pump to facilitate a research project for OSU. But for this representation, it is reasonable to infer that Wagner would have refused to allow Schulte access to his pain pump.

{¶ 39} OSU argues that in *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, the Ohio Supreme Court rejected the need for a jury instruction on respondeat superior that included language that an employer can be liable for a tort committed by an employee even if the tort was committed outside the scope of employment, if the employee was aided in accomplishing the tort by her employment. The court declined to adopt the Restatement of the Law 2d, Agency (1958) Section 219(2)(d). That section permits a master to be liable for the acts of his servant acting outside the scope of his employment if "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." Id.

{¶ 40} While OSU's argument is true as far as it goes, Ohio recognizes claims based on apparent authority. The Ohio Supreme Court distinguished the facts of *Groob* with its holding in *Kerans v. Porter Paint Co.* (1991), 61 Ohio St.3d 486, 575 N.E.2d 428. In *Kerans*, the Ohio Supreme Court held that an employee who sexually harasses another employee over whom he has supervisory duties may be found to have been acting with apparent authority and, therefore, may be found

to have been acting within the scope of employment. The court further stated that even if the supervisor's activities were outside the scope of his employment, summary judgment would not be proper based on a Restatement section that imposes liability on employers if they are aware that an employee represents an unreasonable risk of bodily harm to others. 2 Restatement of the Law 2d, Torts (1965) 125 Section 317.

{¶ 41} The Ohio Supreme Court in *Groob* also noted that a principal can be held liable for an employee who commits fraud on a third party. *Groob,* 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, at ¶ 47. Fraud consists of " '(a) a representation or, where there is a duty to disclose, a concealment of fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or conceal- ment, and (f) a resulting injury proximately caused by the reliance.' " Id., quoting *Gaines v. Preterm–Cleveland Inc.* (1987), 33 Ohio St.3d 54, 55, 514 N.E.2d 709.

{¶ 42} As discussed previously, Wagner has introduced evidence that Schulte was acting with apparent authority as a faculty/researcher when he misrepresen- ted an intention to conduct legitimate research on behalf of OSU. OSU retained Schulte as an employee with access to OSU facilities and equipment, and this apparent authority made it reasonable for Schulte to perpetuate a fraud upon Wagner because he reasonably believed that Schulte was an employee with the authority to gather a sample for a pending research project. Moreover, a genuine issue of material fact remains as to whether OSU knew that Schulte posed an unreasonable risk of bodily harm to Wagner. Summary judgment under these facts is not appropriate.

{¶ 43} Based on the foregoing, we sustain Wagner's sole assignment of error, reverse the judgment of the Court of Claims of Ohio, and remand the cause for further proceedings in accordance with this decision.

Judgment reversed
and cause remanded.

BROWN and McGRATH, JJ., concur.