[Cite as *Wagner v. Ohio State Univ. Med. Ctr.*, 2012-Ohio-3853.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

JOHN T. WAGNER, et al.

    Plaintiffs

    v.

THE OHIO STATE UNIVERSITY MEDICAL CENTER, et al.

    Defendants

Case No. 2005-05124

Judge Peggy L. Bryant
Judge Lisa L. Sadler
Judge Alan C. Travis

DECISION

{¶ 1} Plaintiffs, John T. Wagner (Wagner), and his wife, Marilyn Wagner, brought this action against defendants[1] alleging negligence and loss of consortium. The case was bifurcated as to the issues of liability and damages and the case proceeded to trial before a panel of three judges.[2]

{¶ 2} Gregory T. Schulte graduated from The Ohio State University with his M.D. in 1991 and completed his anesthesiology residency at The Ohio State University College of Medicine. Prior to the events that led to this action, Dr. Schulte was a member of the American Society of Anesthesiologists, the American Board of Pain

---

[1] Defendant, The Ohio State University Medical Center, shall be referred to as "OSU."

[2] On October 18, 2011, the court granted plaintiffs' motion to hold the record open for a reasonable time, to be determined at trial, for plaintiffs to secure the trial testimony of witness Cindy Workman, R.N., by deposition, and to file a transcript of such testimony with the court. No such testimony has been offered and, accordingly, the case is deemed submitted for a decision on the merits.

Medicine, and the Ohio State Anesthesia Association.  When he was hired by OSU, Dr. Schulte was board-certified in anesthesiology and interventional pain medicine, and he was licensed to practice medicine in Ohio.

{¶ 3} On September 21, 2001, Dr. Schulte and the State Medical Board of Ohio (board) entered into a Step I Consent Agreement, regarding Dr. Schulte's substance abuse.  Dr. Schulte was addicted to alcohol and the non-prescription drug Ultram.  Several months thereafter, the board and Dr. Schulte entered into a Step II Consent Agreement followed by an Addendum to the Step II Consent Agreement dated February 13, 2002.

{¶ 4} On March 26, 2002, the Ohio State University College of Medicine and Public Health offered Dr. Schulte a position as a Clinical Assistant Professor of Medicine in the Department of Anesthesiology.  OSU, on behalf of its Health Systems Department of Anesthesiology (Health Systems) subsequently entered into a Physician Employment Agreement with Dr. Schulte effective June 1, 2002.  The agreement required Dr. Schulte to obtain clinical privileges at The Ohio State University Hospitals (OSU Hospital).  After several months of satisfactory service in surgery, Dr. Schulte was permitted to practice in the Chronic Pain Center, known commonly as the pain clinic, which operated under the umbrella of the Department of Anesthesiology.[3]

{¶ 5} In the spring of 2004, Dr. Schulte began to exhibit signs that he was under the influence of drugs while working in the pain clinic.  Under the terms of the consent agreement with the board, Dr. Schulte was required to undergo periodic urinalysis and in May 2004, one such screening revealed that he had taken the drug methadone.  In June 2004, pain clinic nurse Annabelle Marshal voiced her suspicions that Dr. Schulte had stolen unused Fentanyl patches that were supposed to be discarded.  Pain clinic nurse manager, Jill Niese, reported in July that she suspected Dr. Schulte had taken a syringe containing the narcotic Dilaudid from a tray in the clinic.  On August 12, 2004, Dr. Steven Severyn, Clinical Assistant Professor in the Department of Anesthesiology, was asked to care for one of Dr. Schulte's patients in the pain clinic because Dr. Schulte appeared to be impaired.  Dr. Severyn assumed Dr. Schulte's impairment was due

---

[3]In February 2003, eight months into Dr. Schulte's initial contract term, OSU and Dr. Schulte entered into a new Physician Employment Agreement whereby OSU elevated Dr. Schulte's status from

either to Dr. Schulte's misuse of prescribed medication or to an adverse reaction to such medication. Dr. Severyn knew that Dr. Schulte had a serious knee injury and that he suffered from chronic back pain. Dr. Severyn sent Dr. Schulte home that day. He did the same thing on at least one other occasion in September 2004, when Dr. Schulte exhibited slurred speech while at work.

{¶ 6} On September 7, 2004, pain clinic nurses observed Dr. Schulte fall face first into a plate of spaghetti while at work. Dr. Schulte later explained to Dr. Severyn that his conduct on September 7, 2004, was caused by an adverse reaction to the prescribed drug Neurontin.

{¶ 7} In a September 20, 2004 letter, Dr. Severyn informed Dr. Michael Howie, Chair of the Department of Anesthesiology at OSU, of what had occurred on September 7, 2004, as well as Dr. Schulte's explanation. Dr. Howie became very angry when he read the letter because Dr. Schulte had specifically told him that he was no longer taking Neurontin.

{¶ 8} Later in September, after Dr. Schulte had been ejected from a surgical procedure due to his strange behavior, Dr. Howie personally supervised Dr. Schulte's drug screening due to suspicions that Dr. Schulte was using urine from other sources. The testimony shows that by mid to late September 2004, Dr. Howie had reached the limits of his tolerance with Dr. Schulte, and he decided that Dr. Schulte "was finished at the pain clinic."

{¶ 9} Dr. Howie subsequently placed Dr. Schulte on administrative leave, effective September 21, 2004, and forbade him from providing patient care of any sort. The board was subsequently notified of Dr. Schulte's conduct and OSU's actions. Dr. Schulte retained his faculty appointment and a salary of $30,000, but his continued employment was placed "under review." According to Dr. Hagop Mekhjian, Chief Medical Officer for Health Systems, Dr. Schulte had no assigned faculty duties effective September 21, 2004. However, during the pendency of the review proceedings, Dr. Schulte was permitted to keep his pager, and both his faculty ID badge and computer password, which gave him access to OSU facilities, equipment, and computers. Dr. Schulte also retained the OSU scrubs that he had purchased with his own funds.

part-time to full-time (100 percent), thereby increasing his clinical assistant professorship to 50 percent,

{¶ 10} On November 12, 2004, the board suspended Dr. Schulte's license for an indefinite period of not less than one year. As a result of the board's actions, OSU terminated Dr. Schulte's employment with Health Systems effective December 1, 2004, and revoked his staff privileges.

{¶ 11} On January 3, 2005, OSU became aware that, in December 2004, Dr. Schulte had siphoned morphine from the pain pump of his own critically ill father, Tom Schulte, who was also a pain clinic patient. On January 4, 2005, Drs. Howie and Severyn met with OSU legal counsel regarding Dr. Schulte's conduct. As a result of the meeting, it was decided that OSU would contact the Ohio Department of Job and Family Services (ODJFS) in order to report an incident of elder abuse. The idea of providing notifications or warnings to other pain pump patients such as Wagner was not discussed during the meeting. On January 6, 2005, the incident was reported to ODJFS.

{¶ 12} On January 12, 2005, Dr. Schulte, while dressed in his OSU scrubs with his OSU faculty badge, using his customary bag of equipment, and representing that he was performing research on behalf of OSU, gained access to Wagner's home and siphoned morphine from his implanted pump. Six days later, Dr. Schulte went to the home of OSU patient Jesse Persinger and siphoned morphine from his pain pump.

{¶ 13} On January 18, 2005, Wagner's home nurse, C.R.N.I. Barbara Mortimer, was sent to his home after her office had received a call regarding his condition. Mortimer was not scheduled to visit Wagner until January 24, 2005, but when she arrived at Wagner's home, he was sweating and complaining of excruciating pain. When she checked his pain pump and withdrew an orange colored fluid, she suspected something was wrong and called the pain clinic.

{¶ 14} On January 21, 2005, OSU learned that Dr. Schulte had victimized Persinger, and on January 27, 2005, Dr. Severyn sent a letter regarding Dr. Schulte to 63 current pain clinic patients who were receiving medication via pain pumps. The letter was issued on Ohio State Pain Control Center letterhead and it reads in relevant part as follows:

and his physician appointment to 50 percent.

{¶ 15} "Dear Patient,

{¶ 16} "The purpose of this letter is to inform you that Todd G. Schulte, M.D., (sic) who was previously your pain management physician, is no longer on the staff of The Ohio State Pain Control Clinic and he is no longer involved with your care. If Dr. Schulte contacts you, please let us know immediately by calling us at (614) 293-1070.

{¶ 17} "It is very important that no one other than your current physician from The Ohio State Pain Control Clinic or your usual home health care nurse performs any procedures involving your pain pump. If Dr. Schulte asks to see you or examine your pump, you should refuse and call us immediately."

{¶ 18} Wagner was hospitalized for complications arising from Dr. Schulte's crime and he remained hospitalized until February 7, 2005. Dr. Schulte was brought into custody and there are no other known victims. Dr. Schulte ultimately pled guilty to criminal charges from his conduct as described above, and he was sentenced to a term of imprisonment.

{¶ 19} On April 5, 2005, plaintiffs brought an action against OSU sounding in negligence. The case was stayed during the pendency of the case plaintiffs filed against Dr. Schulte in the Franklin County Court of Common Pleas. On July 17, 2008, the stay was lifted and on September 28, 2009, this court granted OSU's motion for summary judgment. Plaintiffs filed a notice of appeal to the Tenth District Court of Appeals and on June 8, 2010, the Court of Appeals reversed the decision of this court and remanded the case for further proceedings. See *Wagner v. Ohio State Univ. Med. Ctr.,*188 Ohio App.3d 65, 2010-Ohio-2561.

{¶ 20} The opinion of the court of appeals, which now represents the law of this case, provides in relevant part:

{¶ 21} "[I]n a negligence action for the injury to Wagner, Wagner must establish that genuine issues of material facts exist as to whether OSU owed him a duty, that OSU breached that duty, and that the breach was a proximate cause of the injury. *Albright v. Univ. of Toledo* (Sept. 18, 2001), 10th Dist. No. 01AP-130; *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318. The existence of a duty in a negligence action is

a question of law for the court to determine. Id. Whether a defendant owes a plaintiff a duty in a negligence case is a fundamental aspect of establishing actionable negligence, and if there is no duty or obligation of care, no legal liability may arise for the negligent act. *Albright,* quoting *Jeffers v. Olexo* (1989), 43 Ohio St.3d 140, 142.

{¶ 22} "* * * Construing these facts in the light most favorable to Wagner, we find that a genuine issue of material fact exists as to whether Schulte's actions were a reasonably foreseeable consequence of OSU's decision to retain Schulte in a faculty/researcher position at OSU. OSU, knowing of Schulte's misconduct towards his father, should have reasonably foreseen the likelihood that its employee might engage in such actions with another well-known patient who had developed a father-son type of relationship with Schulte. The existence of a special relationship as explained in *Abrams* coupled with the foreseeability of the injury, and the decision to avoid informing Wagner as to Schulte's whereabouts in a drug program, creates a genuine issue of material fact as to whether OSU had a duty to protect Wagner from such harm." Id. at ¶22, 36.

{¶ 23} Plaintiff John Wagner testified that he was born in 1942. Wagner was a printer by trade but he retired in 1991 from a career in labor relations. He was diagnosed with acute pancreatitis in 1990 and the condition is now chronic. Wagner met Dr. Schulte at the OSU pain clinic in 1990 and the two men became friends. Eventually, Wagner grew to think of Dr. Schulte as a son.

{¶ 24} In January 2000, Dr. Schulte, by then a licensed anesthesiologist, surgically implanted a morphine pump into Wagner. The pump relieved Wagner's pain, and dramatically improved his quality of life. Wagner testified that Dr. Schulte "delivered him from Hades." Wagner now receives morphine continuously via the pain pump and he also takes Percocet for additional pain relief.

{¶ 25} Wagner also related that he was the first patient ever to receive subcutaneous infusions of pain medication via pain pump and that Dr. Schulte was the first physician to ever provide such treatment. Wagner testified that he employed what he referred to as "mind control techniques" in order to control his pain prior to receiving treatment from Dr. Schulte. He stated that he had also used short wave radio programs in aid of his mind control techniques and that he taught such techniques to patients at

Mount Carmel hospital in the 1980s and 1990s. According to Wagner, Dr. Schulte had referred other chronic pain patients to him for such treatments.

{¶ 26} In or about July 2004, Dr. Schulte asked Wagner to attend a meeting with Dr. Schulte and Dr. Howie. According to Wagner, Dr. Schulte told him he was having a problem with another physician who was jealous of his work and that the dispute was affecting Dr. Schulte's ability to acquire malpractice insurance. Wagner testified that he was at the meeting to personally attest to Dr. Schulte's competency as a physician. Wagner remembered that Dr. Schulte appeared very sleepy at that meeting. Wagner testified that he had no idea, at that time, that Dr. Schulte was a drug impaired physician practicing under a consent agreement and that Dr. Howie did not mention this fact to him at the meeting.

{¶ 27} Wagner testified that the meeting with Dr. Howie was the only time he saw or spoke with Dr. Schulte in the fall of 2004 and that it was his last contact with Dr. Schulte prior to the day of the incident at his home. On that day, January 12, 2005, Wagner received a telephone call from Dr. Schulte, at which time Dr. Schulte told him he was ready to begin his "substance P" research and he asked Wagner if he would agree to participate. Dr. Schulte also asked Wagner if he had heard any rumors about him. Wagner responded that he had not. Dr. Schulte arrived at Wagner's home about one hour later carrying his brown briefcase with the "same computer setup used by the nurses," and wearing green scrubs with his OSU faculty ID badge. Wagner observed that Dr. Schulte was "hunched over at the waist," and when he inquired, Dr. Schulte told him he was scheduled for back surgery. According to Wagner, Dr. Schulte told him that he needed to obtain a sample of Wagner's spinal fluid for his research. Dr. Schulte inserted a syringe through Wagner's skin and into the morphine reservoir of his pump to remove morphine for his own use.

{¶ 28} Wagner remembered that Dr. Schulte came to his home again on January 14, 2005, at which time Dr. Schulte, once again, asked Wagner if he had heard any rumors about him. Wagner told Dr. Schulte that he did not pay attention to such things. He also asked if Wagner would trade his Percocet for some other pain pills Dr. Schulte had brought with him. Wagner made the trade and then asked Dr. Schulte to leave; Wagner never took the pills Dr. Schulte had given him.

{¶ 29} Plaintiffs argue that OSU is liable to them for the harm inflicted by Dr. Schulte inasmuch as OSU negligently "retained" Dr. Schulte in his faculty position after having knowledge that Dr. Schulte was once again taking illegal drugs, that his hospital privileges had been revoked due to his drug use, and that his medical license had been revoked for drug related violations of his consent agreement. Plaintiffs further allege that OSU cloaked Dr. Schulte with apparent authority to act on its behalf by "allowing him computer access, access to equipment, and allowing him to keep his ID card and pager * * *, [all of] which allowed Schulte to access Wagner's pain pump under the guise of doing research * * *." *Wagner*, supra, ¶30.

{¶ 30} OSU admits that Dr. Schulte was retained as a faculty member so that he could keep his health insurance and a small salary, but that he was given no duties. No meaningful explanation was given for the decision to allow Dr. Schulte to retain his ID badge and computer; the scrubs were Dr. Schulte's personal property. OSU also denies that Dr. Schulte was ever given authority to conduct "substance P" research at or about the time he committed his crimes.

{¶ 31} In *Wagner*, the court of appeals stated: "This court clarified the issue of duty in a negligent retention case in *Abrams v. Worthington,* 169 Ohio App.3d 94, 2006-Ohio-5516. The existence of a duty will depend on the foreseeability of the injury to the plaintiff. Id. at ¶15. The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act. Id. 'The foreseeability of a criminal act depends upon the knowledge of the defendant, which must be determined by the totality of the circumstances, and it is only when the totality of the circumstances are "somewhat overwhelming" that the defendant will be held liable.' *Staten v. Ohio Exterminating Co., Inc.* (1997), 123 Ohio App.3d 526, 530, quoting *Evans v. Ohio State Univ.* (1996), 112 Ohio App.3d 724, 742, citing *Feichtner v. Cleveland* (1994), 95 Ohio App.3d 388, 396." *Wagner,* supra, ¶23.

{¶ 32} The circumstances that existed on or about November 12, 2004, when OSU elected to retain Dr. Schulte in his position as a faculty member would not have caused a reasonable person in Dr. Howie's or Dr. Severyn's position to anticipate the harm Dr. Schulte would subsequently inflict upon Wagner in his home. Both Dr.

Severyn and Dr. Howie knew that Dr. Schulte had no duties as a faculty member. Dr. Howie testified that in order for OSU to formally terminate Dr. Schulte's faculty appointment he would need to initiate what he referred to as a "bureaucratic process," by requesting such action from Assistant Dean of Academic Affairs, Dr. Bornstein. Dr. Howie did not believe that such action was necessary for the protection of OSU patients inasmuch as Dr. Schulte had been placed on administrative leave and, consequently, he had no access to patients at the pain clinic. In other words, Dr. Howie did not believe that retaining Dr. Schulte in his faculty position had any bearing upon patient care. Thus, Dr. Howie felt no compulsion to expedite the process.

{¶ 33} Moreover, given the established process by which pain clinic patients received their medications, neither Dr. Howie nor Dr. Severyn could have reasonably foreseen that Dr. Schulte would have any contact with pain clinic patients subsequent to the actions taken by OSU regarding his clinical privileges.

{¶ 34} The process by which OSU pain clinic patients receive subcutaneous pain medication via electronic pumps, the manner in which the pumps are used by the patients in their homes, and the method by which patients receive pain medication for use in the pumps, was explained to the court by a number of witnesses. In 2005, Jill Niese was Nurse Manager of the OSU Chronic Pain Center, which is now known as the Spine Center. According to Niese, pain clinic patients are seen by the nurses and physicians employed at the clinic when the patients arrive at the clinic for their periodic appointments; OSU pain clinic nurses and physicians do not visit patients in their homes. This is true for the in-home pain pump patients as well. Such patients arrive at the clinic for periodic visits where they are seen by a pain clinic physician and prescribed pain medication. According to Niese, in 2005, those prescriptions were filled by a company known as SBH and they were then taken to the patient's home and delivered to the patient's pain pump by nurses employed at Three Rivers Option Care (Option Care). Niese testified that in or about January 2005 she was able to identify and obtain accurate contact information for a total of 63 OSU-affiliated pain clinic patients who had been fitted either with internal or external pain pumps and who were using those pumps while they were in their homes. Mortimer worked for Option Care in 2005 and her duties included visiting the homes of OSU Pain Clinic patients to check

and refill their internal SyncroMed pumps. She testified that Wagner was her patient for approximately two years and that she saw him every 60 days for his refill.

{¶ 35} It is clear that pain clinic nurses and physicians did not see patients in their homes. Even though Dr. Howie admitted knowledge that Dr. Schulte was abusing drugs in late 2004, and that he had attempted to illegally obtain drugs while working at the pain clinic, he maintained that Dr. Schulte's temporary retention as a faculty member had nothing to do with the events that transpired in Wagner's home on January 12, 2005. The court agrees.

{¶ 36} In short, the court does not believe that there was any reason for anyone associated with OSU to suspect that Dr. Schulte posed a risk of harm to OSU patients using pain pumps in their homes. Thus, OSU did not breach a duty owed to Wagner when it retained Dr. Schulte as a faculty member.

{¶ 37} With respect to the question of whether OSU should be held liable to plaintiffs under the theory of apparent authority, the court of appeals in *Wagner* stated:

{¶ 38} "Ohio recognizes claims based on apparent authority. * * * In *Kerans [v. Porter Paint Co.* (1991), 61 Ohio St.3d 486], the Ohio Supreme Court held that an employee who sexually harasses another employee over whom he has supervisory duties may be found to have been acting with apparent authority, and, therefore, may be found to have been acting within the scope of employment. The court further stated that even if the supervisor's activities were outside the scope of his employment, summary judgment would not be proper based on a Restatement section that imposes liability on employers if they are aware that an employee represents an unreasonable risk of bodily harm to others. 2 Restatement (Second) of Law, (1965), Torts, 125, Section 317." *Wagner*, supra, ¶40.

{¶ 39} Written stipulations filed by the parties establish that while Dr. Schulte is identified as a "co-investigator" on two proposed research projects, Dr. Schulte was never authorized to conduct research on either of the projects and neither of these projects ever proceeded to human trials. Hence, he was outside the scope of his employment. Moreover, the evidence establishes that the only person with whom Wagner ever discussed "substance P" research was Dr. Schulte himself. Dr. Schulte never told anyone at OSU that he spoke with Wagner about such research and no other

OSU representative spoke of such research with Wagner. Although Dr. Schulte sought approval from Dr. Howie in December 2004, to become involved in research, the court is convinced that Dr. Howie never seriously considered the request. The evidence thus does not support Wagner's contention that OSU was aware Dr. Schulte may be attempting to conduct research.

{¶ 40} Based upon the weight of the evidence, plaintiffs have failed to establish either that OSU cloaked Dr. Schulte with apparent authority to conduct research in the homes of pain clinic patients or that OSU knew Dr. Schulte was speaking with patients about substance P research.[4]

{¶ 41} Plaintiffs also contend that OSU had a duty to warn them about Dr. Schulte when Wagner arrived at the pain clinic for a scheduled appointment on November 15, 2004. On that day, Wagner was seen at the OSU Pain Clinic by physician Dr. Rebecca Guttman and, according to Wagner, when he asked Dr. Guttman where Dr. Schulte was, she told him "I don't know where he is, I'm here to take his place. What do you need?" Wagner claims that OSU was obligated to inform him that Dr. Schulte had been placed on administrative leave due to his drug use and that OSU's failure to so inform him was the proximate cause of his subsequent injury at Dr. Schulte's hands.

{¶ 42} The court of appeals in *Wagner* discussed the case law underlying such an argument as follows:

{¶ 43} "In addition, after OSU had removed Schulte from his clinical duties due to drug abuse, OSU was evasive when Wagner inquired as to Schulte's whereabouts even though Schulte had been removed from his clinical duties and referred to the Cleveland Clinic for in-patient evaluation. In *Douglass v. Salem Community Hosp.,* 153 Ohio App.3d 350, 2003-Ohio-4006, ¶69, the court held that a special relationship arose once a person inquires about a former employee and the hospital responds. *Douglass* involved a former employee who resigned because of a past history of child molestation. The inquiry was whether a mother's child should accompany his cousin for

---

[4]The court of appeals in *Wagner* acknowledged that a cause of action based upon the rule of law articulated in Section 219(2)(d) of Restatement (Second) of the Law, 1958, Agency, has not been recognized in Ohio. *Wagner*, supra, ¶39. Thus, OSU cannot be subjected to liability to plaintiffs simply because Dr. Schulte "'purported to act or to speak on behalf of [OSU] and there was reliance upon apparent authority, or [Dr. Schulte] was aided in accomplishing the tort by the existence of the agency relationship.'" Id., quoting Restatement of the Law 2d, Agency (1958), Section 219 (2)(d).

a weekend stay at the former employee's home. The mother was not told about its suspicions about the former employee or even that the employee was no longer employed. The court stated, 'While the hospital may not have had an affirmative duty to disclose to all former patients or clients that were involved with [the former employee] about his past history, when inquiry was made and it was asked for advice concerning him, it was bound to offer that advice in a non-negligent manner.'" Id. at 368. *Wagner*, supra, ¶34.

{¶ 44} The facts of this case are markedly different from those discussed by the court in

{¶ 45} *Douglass*. First, Wagner's own testimony shows that he did not leave the pain clinic on November 15, 2004, with a positive view of Dr. Schulte's employment status. By his own admission, he became confused about Dr. Schulte's employment and frustrated. More importantly, as noted above, the facts and circumstances that existed at that time would not have alerted a reasonable employer in OSU's position that Dr. Schulte posed a risk of harm to Wagner while he was in his own home.

{¶ 46} There was no reason for OSU to anticipate that Dr. Schulte would ever contact Wagner or any of his other patients outside of the pain clinic. And, at that point in time, OSU had no knowledge, either actual or constructive, that Dr. Schulte had ever attempted to steal drugs from any patient.

{¶ 47} In short, OSU was not legally obligated to notify Wagner of Dr. Schulte's status. Unlike the *Douglass* case, there is no statute that requires such notice be given by OSU under these circumstances.[5]

---

[5]The court notes H.B. No. 417, which was introduced in the 129th General Assembly, calls for the enactment of R.C. 4731.228, which shall provide, in part:

"(C)(1) Except as provided in division (C)(2) of this section, a health care entity *shall send notice of the termination of a physician's employment to each patient who received physician services from the physician in the two-year period immediately preceding the date of employment termination*. Only patients of the health care entity who received services from the physician are to receive the notice.

"(2) If the health care entity provides to the physician a list of patients treated and patient contact information, the health care entity may require the physician to send the notice required by this section.

"(D) The notice provided under division (C) of this section shall be provided not later than five days after termination of the physician's employment with the health care entity and in accordance with rules adopted by the state medical board under section 4731.05 of the Revised Code. The notice shall include at least all of the following:

"(1) A notice to the patient that the physician will no longer be practicing medicine as an employee of the health care entity;

"(2) The physician's name and any information provided by the physician that the patient may use to contact the physician;

**{¶ 48}** Plaintiffs also argue that when OSU became aware that Dr. Schulte had illegally siphoned drugs from his own father's intravenous line, it was reasonably foreseeable that he would do the same to other patients, and that a warning should have been given. In addressing this issue, the court of appeals stated: "In this case, the key inquiry is whether OSU owed a duty to protect Wagner and Schulte's other patients with pain pumps whether they were at OSU or in their homes. Wagner asserts that a letter warning Schulte's former pain pump patients would have protected him from the tortious and criminal acts of Schulte." *Wagner*, supra, ¶27.

**{¶ 49}** There is no disagreement in this case that a letter warning Wagner of the risk of harm posed by Dr. Schulte may have prevented Wagner's injury. There is also no dispute that the letter sent to each of the 63 pain pump patients on January 27, 2005, would have been sufficient. Wagner testified that if he had received such a letter from OSU prior to the time he was contacted by Dr. Schulte in January 2005, he never would have let Dr. Schulte into his home on January 12, 2005.

**{¶ 50}** The parties disagree, however, as to the point in time when the duty to warn arose given the chronology of events leading to Dr. Schulte's crime against Wagner. Plaintiffs argue that a duty arose, at the latest, on January 3, 2005, when OSU received word that Dr. Schulte may have stolen morphine from his father, pain clinic patient, Tom Schulte. OSU argues that the duty arose, at the earliest, on January 21, 2005, when OSU learned that Dr. Schulte had victimized Persinger.

**{¶ 51}** On January 3, 2005, OSU learned that Dr. Schulte had very likely siphoned morphine from his father's pain pump. As of that date, Dr. Schulte had already lost his license to practice medicine, he was terminated from his position at the pain clinic, and had lost his privileges at OSU Hospital. When the court considers the facts and circumstances that Drs. Howie and Severyn either knew or should have known as of January 4, 2005, the court does not believe that Dr. Schulte's subsequent crime against Wagner was reasonably foreseeable.

---

"(3) The date on which the physician ceased or will cease to practice as an employee of the health care entity;
"(4) Contact information for an alternative physician employed by the health care entity." (Emphasis added.)

{¶ 52} The evidence establishes that notice of Dr. Schulte's crime upon Tom Schulte first came to light on January 3, 2005, when Dr. Severyn contacted Cindy Workman R.N., a nurse employed by SBH, and spoke with her regarding her December 30, 2004 visit with Tom Schulte at his home. Dr. Severyn memorialized the conversation in a "memo for record" dated January 3, 2005, and admitted into evidence as Plaintiffs' Stipulated Exhibit 10. What the memo memorializes is a systematic effort by Dr. Schulte, beginning as early as March 2004, to surreptitiously obtain small amounts of the narcotic Dilaudid from his father's pain pump. During her December 30, 2004 visit, however, Workman noticed "three recent puncture marks in the skin overlying the pump access port," and when she accessed the pump reservoir, she found it to be completely empty. When Workman asked Tom Schulte who had done this, he began to cry and then told her it was his son. In her conversation with Dr. Severyn, Workman told him that Dr. Schulte possessed a pump programmer that he had obtained from a former employer.

{¶ 53} As Chair of OSU's Department of Anesthesia, Dr. Howie was responsible for both the Clinical and Academic affairs at OSU. As the direct supervisor of Dr. Severyn, Dr. Howie was ultimately responsible for Dr. Schulte. The evidence shows that Dr. Schulte's mother had passed away in July 2004 and that Dr. Schulte had moved in with his ailing father to assume the responsibility for his care. Tom Schulte was suffering from both dementia and terminal cancer.

{¶ 54} Dr. Howie testified that he never imagined that Dr. Schulte would do such a thing to his father. Dr. Severyn confirmed Dr. Howie's shock and amazement when he was told about the incident with Tom Schulte. Dr. Howie also stated that he considered Dr. Schulte's crimes against Wagner and Persinger to be "worse" than what Dr. Schulte did to his father because neither Wagner nor Persinger were family members.

{¶ 55} Dr. Severyn testified that when he learned that morphine had been taken from Tom Schulte and informed Dr. Howie of this fact on January 4, 2005, both he and Dr. Howie surmised that it was Dr. Schulte who was responsible. Dr. Severyn stated that when he and Dr. Howie met with legal counsel on January 4, 2005, the thought of

notifying pain clinic staff or patients about the incident did not occur to him and that the issue was not discussed.

{¶ 56} When Dr. Severyn was asked if some type of notification or warning could have been published at that time, he stated that it would not have been easy to quickly identify the pain clinic patients who were receiving medications via pain pumps inasmuch as the relevant information would need to be obtained from the records of the pharmaceutical provider, SBH, before a list of recipients could be drawn up. He did not believe any such notification could have been given on or before January 6, 2005. And, although Dr. Severyn's January 27, 2005 letter was ultimately sent to 63 patients, Dr. Severyn suspected that there could have been as many as 150 pain pump patients affiliated with the clinic at that time but that the records for all such patients were not readily available to OSU.

{¶ 57} Dr. Severyn testified that, in consideration of the facts known to him on or about January 4, 2005, he did not believe that a warning letter would have been appropriate given the fact that OSU's suspicions about Dr. Schulte's conduct had not been either independently confirmed or investigated by the proper authorities. He believed that notifying ODJFS and making a report of elder abuse was the proper course of conduct under the circumstances.

{¶ 58} The court finds that Drs. Howie and Severyn were credible witnesses. Based upon their testimony, the court finds that the risk that Dr. Schulte would harm any other pain clinic patients in their homes never occurred to them on January 4, 2005. Dr. Severyn and Dr. Howie knew that OSU pain clinic physicians did not see pain pump patients in their homes and they knew that the patients understood this. The court is convinced that the first time either witness appreciated a risk of harm to other pain pump patients was when they learned of Dr. Schulte's crime against Persinger. The question for the court to answer in determining whether OSU had a legal duty to take action to protect Wagner from harm at Dr. Schulte's hands is whether a reasonably prudent individual standing in the shoes of Dr. Severyn and Dr. Howie would have foreseen Dr. Schulte's subsequent criminal conduct given the facts and circumstances known to them on or about January 4, 2005. In making this determination, the court is

aware that such facts and circumstances must be "somewhat overwhelming" before a duty may be imposed. See *Wagner*, supra, ¶23.

**{¶ 59}** A review of the testimony shows that other persons who became associated with the case were just as shocked by Dr. Schulte's conduct as OSU. When speaking of the crime against Wagner, Officer Stephanie Russell of the Fairfield County Sheriff's Department testified that it was a "striking case" and that she had never investigated anything like it before. Wagner's own daughter, Julie Feasel, referred to the incident as a "Crazy, made for T.V. movie."

**{¶ 60}** "There is no formula for ascertaining whether a duty exists. Duty is the court's expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. Any number of considerations may justify the imposition of duty in particular circumstances, including the guidance of history, continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall." *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318. (Internal citations omitted.)

**{¶ 61}** In this instance, OSU knew that Dr. Schulte was either living in the home of his critically ill father or was with him on a regular basis, that Dr. Schulte had assumed the role of caregiver after his mother's death, and that Tom Schulte was evidencing signs of dementia. Although both Dr. Severyn and Dr. Howie were personally shocked to hear that Dr. Schulte had victimized his father in this fashion, reports of drug addicted children stealing prescription drugs from their parents is a known form of elder abuse.

**{¶ 62}** In considering whether Dr. Howie or Dr. Severyn should have anticipated Dr. Schulte's crime, the court must consider the absence of any evidence that pain pump patients had ever been the subject of invasive clinical research in their homes. Even though Wagner testified that he knew something about "substance P" research from speaking with Dr. Schulte, there is no evidence that OSU knew that Dr. Schulte had discussed such research with any of his patients. As noted above, what evidence there is of this research establishes that OSU never authorized Dr. Schulte to conduct research on pain pump patients. OSU learned that Dr. Schulte used the substance P research as a reason to enter patients' homes only after Dr. Severyn met with Persinger

on January 21, 2005. It was at that time that Dr. Severyn decided to issue a warning letter to pain pump patients.

{¶ 63} Plaintiffs, however, assert that Wagner's presence at a July 2004 meeting regarding Dr. Schulte's medical malpractice coverage evidences the existence of a relationship between OSU and Wagner of such a nature that OSU assumed a duty to warn Wagner of the risk posed by Dr. Schulte in January 2005. According to Wagner, in July 2004, Dr. Schulte asked Wagner to accompany him to a meeting with Dr. Howie for the ostensible purpose of discussing Dr. Schulte's difficulties in obtaining malpractice insurance. According to Wagner, Dr. Schulte "seemed very tired," and he appeared "to be very sleepy" during the meeting. Wagner testified that he did not suspect Dr. Schulte of drug abuse at that time. This was the first and only time Dr. Howie met Wagner.

{¶ 64} There is no question that the physician-patient relationship between the two was a longstanding one and that OSU knew this to be true. However, accepting Wagner's perspective that he and Dr. Schulte had a father and son type of relationship, there was little to no evidence in this case to support a finding that OSU knew that such an intimate relationship existed and that the relationship was much closer than the physician-patient relationship OSU physicians had with their other pain clinic patients.

{¶ 65} Wagner testified that in the course of his relationship with Dr. Schulte, Dr. Schulte always contacted him and that he never contacted Dr. Schulte. He also acknowledged that the last time he saw or spoke with Dr. Schulte prior to January 12, 2005, was at the July meeting with Dr. Howie. According to Wagner, that meeting was the only contact he had with Dr. Schulte in 2004, outside of his scheduled appointments at the pain clinic. Although Wagner specifically asked about Dr. Schulte's whereabouts during his scheduled appointment in November 2004, the court does not find such an inquiry to reveal an intimate father and son relationship. Nurse Niese testified that Wagner once told her that he trusted Dr. Schulte like a son, but that was on January 27, 2005, after the crime had been committed.

{¶ 66} In the opinion of the court, Wagner's presence at the meeting in July evidenced only that Wagner had a long standing physician-patient relationship with Dr. Schulte and that he believed Dr. Schulte was a fine physician. Such evidence does not permit an inference that OSU had a special relationship with Wagner such that OSU

assumed a duty to protect Wagner, above all other patients, from a crime that occurred more than six months later at Wagner's personal residence.

{¶ 67} In short, the facts and circumstances known to OSU prior to the time it learned of Dr. Schulte's crime upon Persinger, would not have alerted a reasonable employer/caregiver in OSU's position that Dr. Schulte posed a foreseeable and unreasonable risk of harm to Wagner while Wagner was in his own home. OSU had taken reasonable steps, at that time, to protect its pain pump patients from the foreseeable risks posed by Dr. Schulte when it terminated Dr. Schulte from his clinical position and informed both the medical board and ODJFS of OSU's suspicion that he had committed a crime upon his elderly father. Thus, it is the conclusion of the court that OSU did not breach a duty of care owed to plaintiffs and that plaintiffs have failed to prove their claim by a preponderance of the evidence. Accordingly, judgment shall be rendered in favor of defendants.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

JOHN T. WAGNER, et al.

      Plaintiffs

      v.

THE OHIO STATE UNIVERSITY MEDICAL CENTER, et al.

      Defendants

Case No. 2005-05124

Judge Peggy L. Bryant
Judge Lisa L. Sadler
Judge Alan C. Travis

## JUDGMENT ENTRY

{¶ 68} This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendants. Court costs are assessed against plaintiffs. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

 

_____
PEGGY L. BRYANT
Judge

_____
LISA L. SADLER
Judge

_____
ALAN C. TRAVIS
Judge

cc:

Karl W. Schedler                        Robert G. Palmer
Assistant Attorney General              140 East Town Street, Suite 1200
150 East Gay Street, 18th Floor         Columbus, Ohio 43215
Columbus, Ohio 43215-3130

006
Filed April 2, 2012
To S.C. reporter August 24, 2012